STATE OF CONNECTICUT *v.* HENRY G. ROBINSON
(13440)

PETERS, C. J., HEALEY, CALLAHAN, COVELLO and HULL, Js.

Argued October 10—decision released December 19, 1989

*Wesley W. Horton,* with whom was *Alexandra Davis,* for the appellant (defendant).

*Timothy J. Sugrue,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Herbert G. Appleton,* former assistant state's attorney, for the appellee (state).

HULL, J. A jury found the defendant, Henry G. "Boo" Robinson, guilty of murder in violation of General Statutes § 53a-54a[1] and of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a)[2] and 53a-54a. The trial court thereupon sentenced him to a term of imprisonment of twenty-five years to life on the murder conviction and ten to twenty years on the conspiracy conviction, to run concurrently. On appeal from this judgment, the defendant claims that: (1) prearrest delay deprived him of his right to due process of law under the state and federal constitutions; (2) the conspiracy charge was barred by the statute of limitations; (3) the conspiracy charge was foreclosed as a matter of law by the prior acquittal of the sole alleged coconspirator; (4) there was insufficient evidence to sustain the verdicts on either murder or conspiracy to commit murder; (5) the trial court erred in

[1] General Statutes § 53a-54a provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

admitting certain irrelevant or hearsay testimony of a witness; and (6) if error is found with respect to his prosecution for conspiracy to commit murder, he is entitled to a new trial on the murder charge. We conclude that the prior acquittal of the sole alleged coconspirator foreclosed as a matter of law the conspiracy to commit murder charge. We therefore set aside the judgment of conviction on the charge of conspiracy to commit murder and remand the case to the trial court with direction to dismiss that charge. Given our disposition of the conspiracy charge, we will not address the defendant's second claim on appeal, and we find no error with respect to the defendant's remaining claims.

The jury could reasonably have found the following facts. On May 15, 1981, Hartford police found a body in the trunk of a vehicle parked in a cemetery near the Cleveland Avenue Extension in Hartford. The head of the deceased had been wrapped in a black plastic bag and his hands had been tied. Police later identified the body as that of Henry J. "Rico" Littman and an autopsy showed that he had died from a shotgun wound to the head.

The defendant was implicated in the Littman murder by the testimony of four individuals. Glenda Hightower, the defendant's former girlfriend, testified at trial that in March, 1981, the defendant, Littman and Perry Lee Herring had robbed a bank in Hartford, and that during the course of the robbery Littman's face was not covered. Fearing that Littman would consequently be identified, Herring, in the presence of Hightower, told the defendant that Littman "had to go," and the defendant concurred. During a subsequent conversation between the defendant and Herring, Hightower heard the defendant discuss with Herring his belief that Littman was cooperating with law enforcement authorities.

T. J. Thomas testified that, on the morning of May 15, 1981, he had seen the defendant and another man pass him in the same car in which Littman's body was subsequently found. While Thomas was watching the car, it turned onto the dirt roadway leading into the cemetery, and came to a stop. The two men then jumped out of the car and ran away.

The testimony of Sheila Adams, another of the defendant's girlfriends, revealed that she had spoken with the defendant approximately two weeks after the discovery of Littman's body. In response to her inquiry about the death, the defendant had responded: "I had to kill [him]."

The defendant was further implicated in the Littman murder by Graylon Shannon, a convicted felon, who had shared a jail cell with the defendant and Herring on several occasions while the two were in custody for charges pertaining to Littman's death. Shannon had discussed with the two men the charges pending against them, ostensibly to offer advice and assistance. During the course of these discussions, the defendant and Herring confided in Shannon that they had wanted to get rid of Littman to prevent him from talking to the police. They told Shannon that Littman had been shot with a shotgun and that his body had been heavy and difficult to move. The defendant and Herring also described the route they had taken to the graveyard where they had dumped the car containing the body.

I

Five and one-half years elapsed between the time of the victim's death and the arrest of the defendant. The defendant claims that his due process rights under the United States and the Connecticut constitutions were violated by this lapse of time. Initially we note that the defendant failed to raise this claim at trial by way of a motion to dismiss. We have recently held that "a

defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). We conclude that the defendant's fundamental constitutional rights to due process were not violated.

" ' "The role of due process protections with respect to pre-accusation delay has been characterized as a 'limited' one. *United States* v. *Lovasco,* 431 U.S. 783, 789, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977)." *State* v. *Morrill,* [197 Conn. 507, 521, 498 A.2d 76 (1985)].' *State* v. *Littlejohn,* 199 Conn. 631, 645–46, 508 A.2d 1376 (1986). This court need only determine ' "whether the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney* v. *Holohan,* 294 U.S. 103, 112 [55 S. Ct. 340, 79 L. Ed. 791] (1935), and which define 'the community's sense of fair play and decency'. . . . " *United States* v. *Lovasco,* supra, 790.' *State* v. *Morrill,* supra, 521. 'The due process clause has not replaced "the applicable statute of limitations . . . [as] . . . the primary guarantee against bringing overly stale criminal charges." *United States* v. *Marion,* [404 U.S. 307, 322, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971)] . . . . ' *State* v. *Morrill,* supra, 521–22." *State* v. *John,* 210 Conn. 652, 685, 557 A.2d 93, cert. denied,      U.S.     , 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

"In order to establish a due process violation because of pre-accusation delay, the defendant must show both that actual substantial prejudice resulted from the delay and that the reasons for the delay were wholly unjustifiable, as where the state seeks to gain a tactical advantage over the defendant." *State* v. *Morrill,* supra, 522, and cases cited therein. The record does not substantiate either of these requirements.

The prejudice identified by the defendant stems from the deprivation of his right to have his case presented to a grand jury.[3] Conceding that this court in *State* v. *Mitchell,* 200 Conn. 323, 329–30, 512 A.2d 140 (1986), noted that a probable cause hearing provides a person charged with a crime punishable either by death or by life imprisonment with expansive rights and greater protections than he was afforded under the former grand jury system,[4] the defendant nevertheless claims prejudice in two respects. First, he claims that our determination of the relative protection afforded a criminal defendant by a judicial determination of probable cause as compared to a grand jury determination of probable cause is not dispositive in that "[t]he value of a right is in the eye of the beholder." Accordingly, argues the defendant, since he was entitled to a particular right that was taken away from him by the state's delay, he suffered prejudice. The defendant also claims prejudice in that the grand jury might well have

[3] Prior to November, 1982, the Connecticut constitution required a grand jury indictment as a prerequisite to the prosecution of anyone charged with a crime punishable by death or life imprisonment. *State* v. *Mitchell,* 200 Conn. 323, 326, 512 A.2d 140 (1986). After that date, by virtue of amendment seventeen, directed to article first, § 8 of the Connecticut constitution, individuals similarly charged have a constitutional right to an open and adversarial probable cause hearing. Id., 328–30.

[4] In *State* v. *Mitchell,* 200 Conn. 323, 326–28, 512 A.2d 140 (1986), we discussed the inequities that arose from the secret operation and ex parte nature of the grand jury system.

returned no true bill on the evidence.[5] The short answer to the defendant's claims of prejudice is that a due process violation requires proof of "actual substantial prejudice." Mere perceived prejudice or speculation about potential prejudice is not sufficient to establish a due process violation. See *State* v. *John,* supra, 685–87 (delay of nearly five years held insufficient to dismiss charges); *State* v. *Littlejohn,* supra, 647 (no due process violation in delay of more than five years).

Additionally, we cannot find in this record that the defendant has shown, as he must, that the reasons for the delay were "wholly unjustifiable." The defendant relies on the testimony of T. J. Thomas to establish this necessary element of a due process violation. Thomas testified that, soon after the discovery of Littman's body, he had informed several police officers that he had earlier seen two men running from the car in which the body was found. According to Thomas, the police did not follow up on this information. The defendant argues that the failure of the police to investigate Thomas' statement caused the prearrest delay and was "wholly unjustifiable." The state maintains, however, that the defendant's ultimate conclusion is not supported by the record. We agree. Even were we to determine that the delay would not have occurred had the police followed up on Thomas' statement, the record is devoid of evidence concerning the *reasons* for the police reaction (or inaction) to Thomas' information. Therefore, on the basis of the record before us, while the defendant may have pointed to a reason for the delay, he has not shown that the reason identified was "wholly unjustifiable."

---

[5] The defendant argues that the grand jury would not have had the benefit of Graylon Shannon's testimony, since Shannon did not have contact with the defendant until 1986. We note that Shannon did not testify at the probable cause hearing.

## II

The defendant next claims that the conspiracy charge was foreclosed as a matter of law after the acquittal of the sole alleged coconspirator. The defendant accurately notes that the state alleged and submitted evidence concerning only one alleged coconspirator, Perry Lee Herring, who had been acquitted of the conspiracy charge in a prior trial. See *State* v. *Herring,* 210 Conn. 78, 554 A.2d 686 (1989). The defendant claims that, since he could not have conspired with himself, Herring's acquittal barred the defendant's prosecution for conspiracy to commit murder. The state argues, on the other hand, that Herring's acquittal had no effect on the defendant's prosecution for or conviction of conspiracy to commit murder. The state argues in the alternative that: (1) Connecticut's conspiracy statute is "unilateral" and, therefore, Herring's acquittal had no effect on the defendant's culpability with respect to the conspiracy charge; and (2) even if the conspiracy statute is "bilateral," Herring's acquittal, in a separate trial, is simply an inconsistent verdict that should have no effect on the defendant's conviction.

During the pendency of the present appeal, we held in *State* v. *Grullon,* 212 Conn. 195, 199, 562 A.2d 481 (1989), that our conspiracy statute is bilateral in nature: "Our examination of the definition of the crime of conspiracy in § 53a-48 convinces us that the legislature has determined that conspiracy requires a showing that two or more coconspirators intended to engage in or cause conduct that constitutes a crime." Given our holding in *Grullon,* therefore, we need only address the following question: When only two persons are alleged to have conspired to commit a crime and they are tried separately, does the acquittal on the charge of conspiracy of the first person tried bar the state from pros-

ecuting the remaining conspirator for that same conspiracy? We answer this question in the affirmative.

It has traditionally been held that a single conspirator may not be convicted in the same proceeding or prosecution in which all of the alleged coconspirators are acquitted. See generally annot., 19 A.L.R.4th 192, and cases cited therein. "The apparent basis for the traditional rule is the notion that the acquittal of all but one potential conspirator negates the possibility of an agreement between the sole remaining defendant and one of those acquitted of the conspiracy and thereby denies, by definition, the existence of any conspiracy at all. See, e.g., *United States* v. *Goodwin,* 492 F.2d 1141, 1144 (5th Cir. 1974); *Farnsworth* v. *Zerbst,* 98 F.2d 541, 544 (5th Cir. 1938), cert. denied, 307 U.S. 642, 59 S. Ct. 1046, 83 L. Ed. 1523 (1939) ('such judgments prove that there was in fact no criminal agreement'); *United States* v. *Austin-Bagley Corp.,* 31 F.2d 229, 233 (2d Cir.), cert. denied, 279 U.S. 863, 49 S. Ct. 479, 73 L. Ed. 1002 (1920) (per L. Hand, J.; 'verdict must not itself deny the existence of the essential facts' of conspiracy); *Feder* v. *United States,* 257 F. 694, 697 (2d Cir. 1919) ('reason for the rule is . . . the indivisibility of the crime')." *United States* v. *Espinosa-Cerpa,* 630 F.2d 328, 331 (5th Cir. 1980). The defendant argues, therefore, that it is a natural extrapolation from this principle that a lone alleged conspirator should also not be susceptible to conviction in a separate prosecution following the acquittal of all of his alleged coconspirators.

Authorities are split over whether the defendant's position is in fact an appropriate expansion of the traditional rule. See generally annot., 19 A.L.R.4th 192, and cases cited therein. Those courts that have refused to extend the rule to a situation where the acquittals of the defendant's alleged coconspirators occurred in

a prior trial before a different jury have argued that an acquittal is not tantamount to a determination of innocence and that the proof may differ from one trial to another. Central to the reasoning of these courts is their contention that consistent verdicts, even as to conspiracy convictions, are not required at separate trials. See *United States* v. *Irvin,* 787 F.2d 1506, 1512–14 (11th Cir. 1986); *United States* v. *Espinosa-Cerpa,* supra, 332; *United States* v. *Musgrave* 483 F.2d 327, 333 (5th Cir.), cert. denied, 414 U.S. 1023, 94 S. Ct. 447, 38 L. Ed. 2d 315 (1973); *People* v. *Superior Court,* 44 Cal. App. 3d 494, 500, 118 Cal. Rptr. 702 (1975).

It is our view, supported by our holding in *Grullon,* that the crime of conspiracy is unique in our criminal justice system in that it is directed at group culpability rather than at individual culpability.[6] It is this qualitative difference from other crimes that prevents us from embracing the view urged by the state, and adopted by the above-cited cases, that different judicial dispositions as to various members of a group alleged to have participated in a single conspiracy are merely inconsistent verdicts. " 'The gravamen of the crime of conspiracy is the *unlawful combination* and

---

[6] The very reason conspiracy has evolved as an offense distinct from the substantive offense the conspirators agree to commit is the perceived danger of group action. As Justice Frankfurter observed in *Callanan* v. *United States,* 364 U.S. 587, 593–94, 81 S. Ct. 321, 5 L. Ed. 2d 312, reh. denied, 365 U.S. 825, 81 S. Ct 687, 5 L. Ed. 2d 703 (1961), "collective criminal agreement—partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed. In sum, the danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise."

·an act done in pursuance thereof, not the accomplishment of the objective of the conspiracy.' *State* v. *Stevens,* 178 Conn. 649, 655, 425 A.2d 104 (1979). 'Conspiracy is an inchoate offense *the essence of which is an agreement* to commit an unlawful act. *Iannelli* v. *United States,* 420 U.S. 770, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975); *United States* v. *Alvarez,* 610 F.2d 1250 (5th Cir. 1980); *United States* v. *Cuesta,* 597 F.2d 903 (5th Cir. 1979). The *prohibition* of conspiracy *is directed* not at the unlawful object, but *at the process of agreeing* to pursue that object.' *United States* v. *Simms,* 508 F. Sup. 1188, 1196 (W.D. La. 1980)." (Emphasis added.) *State* v. *Beccia,* 199 Conn. 1, 3, 505 A.2d 683 (1986). Because the essence of conspiracy is the mental confederation of two or more persons,[7] the crime is in every sense indivisible.

The defendant in the present case could legally have been convicted of conspiracy only if the jury found that another person—specifically Herring—had participated in an illegal agreement. Herring's culpability was thus an essential element of the defendant's offense. Tried on the merits of the criminal conspiracy charge, Herring was acquitted of having conspired with the defendant to commit murder. It is our view that the verdict as to Herring vitiated the very essence of the conspiracy: the combination or agreement of two or more persons. Accordingly, we hold that, as a matter of law, the conspiracy charge against the defendant was barred after the acquittal of the sole alleged coconspirator.[8]

---

[7] This notion that the gist of conspiracy is the agreement dates back to 1611 with a decision of the Court of Star Chamber. *Poulterers' Case,* 77 Eng. Rep. 813 (1611); see W. LaFave & A. Scott, Criminal Law (1972) p. 453.

[8] Other courts have likewise taken this position. See *United States* v. *Bruno,* 333 F. Sup. 570 (E.D. Pa. 1971); *Eyman* v. *Deutsch,* 92 Ariz. 82, 373 P.2d 716 (1962) (even though defendant entered guilty plea after alleged coconspirator was found not guilty of same conspiracy, acquittal of coconspirator operated to deprive court of jurisdiction to render judgment of

## III

The defendant next challenges the sufficiency of the evidence presented at trial. At the close of the state's evidence and again prior to sentencing, the defendant moved for judgments of acquittal. Both motions were denied by the trial court. On appeal, the defendant renews his claim that there was insufficient evidence to sustain the verdicts on either murder or conspiracy to commit murder. Given our finding of error with respect to the conspiracy conviction, we will address the defendant's sufficiency claim only with respect to the murder conviction. We are not persuaded that the evidence was insufficient to support the defendant's conviction of murder.

"In accordance with well established principles, appellate analysis of a claim of insufficiency of the evidence requires us to undertake a twofold task. 'We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the jury's verdict. We then determine whether, upon the facts thus established and the inferences reasonably drawn therefrom, the jury could reasonably have concluded that the cumulative effect of the evidence established guilt beyond a reasonable doubt . . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct.' *State* v. *Sinclair,* 197 Conn. 574, 576, 500 A.2d 539 (1985), and cases there cited." *State* v. *Rollinson,* 203 Conn. 641, 665–66, 526 A.2d 1283 (1987).

conviction on defendant's guilty plea); *Pearce* v. *State,* 330 So. 2d 783 (Fla. App.), cert. denied, 341 So. 2d 293 (Fla. 1976) (defendant charged with conspiring with two who stood trial and were acquitted was entitled to dismissal); *Rosenberg* v. *State,* 54 Md. App. 673, 460 A.2d 617 (1983) (prior acquittal of coconspirator charged with maintaining bawdy house mandated acquittal of subsequently tried coconspirator).

The elements of murder with which the defendant was charged under General Statutes § 53a-54a are: (1) intent; (2) causation; and (3) death by killing as opposed to death by accident or suicide. *State* v. *Avcollie,* 178 Conn. 450, 460, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980), aff'd, 188 Conn. 626, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983). The disputed elements in the instant case were "intent" and "causation,"[9] to which the state presented the following evidence. Littman participated in a bank robbery with the defendant and Herring in March, 1981. Soon thereafter, the defendant concurred with Herring that Littman "had to go" because he had been unmasked during the course of that robbery. Approximately two weeks after the robbery, the defendant voiced concern that Littman was cooperating with law enforcement authorities. On May 15, 1981, the defendant was seen riding in, and running from, the car in which Littman's body was later found. Two weeks after Littman's death, the defendant clearly confessed to having killed him. Six years after Littman's death, the defendant and Herring explained to Shannon the reasons they had wanted to get rid of Littman and the way they had gone about doing it.

The defendant argues that while the testimony outlined above constitutes "some" evidence that the defendant murdered Littman, this court cannot adequately review his sufficiency claim without looking to the credibility of the testimony presented at trial. In particular, the defendant argues that the testimony of Adams and Shannon was necessary to establish the defendant's guilt of murder beyond a reasonable doubt, but that their testimony was so incredible that the ver-

[9] The defendant stipulated that the body that was autopsied in this case was that of Henry Littman, and no dispute arose at trial over the fact that Littman died as the result of a close range shotgun blast to the head.

dict must necessarily fall. Adams testified that, after drinking much of a fifth of vodka chased with apple wine, the defendant admitted to having killed Littman. On cross-examination, Adams explained that, on a prior occasion when the defendant had consumed such quantities of alcohol, he had hallucinated that she had killed his brother. The defendant argues that his history of hallucinations casts doubt on the credibility of the confession narrated by Adams. The defendant further argues that it "is difficult to think that anyone would [have] believe[d] anything Shannon said except for the wealth of detail he reported." The defendant argues that this detail was explained during cross-examination when Shannon admitted to having reviewed the police report and the statements in the arrest warrant application prior to testifying. Shannon's admission, according to the defendant, rendered his testimony on direct examination less credible. In effect, the defendant is asking us to review the credibility of the testimony given by these witnesses in determining whether sufficient evidence was presented. This we will not do.

" ' "The trier of the facts determines with finality the credibility of the witnesses and the weight to be accorded their testimony. 'We cannot retry the facts or pass upon the credibility of the witnesses.' *Johnson* v. *Flammia,* 169 Conn. 491, 497, 363 A.2d 1048 (1975)." ' *State* v. *Haddad,* 189 Conn. 383, 389, 456 A.2d 316 (1983), quoting *State* v. *Penland,* 174 Conn. 153, 157–58, 384 A.2d 356, cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d 404 (1978)." *State* v. *Crump,* 201 Conn. 489, 491, 518 A.2d 378 (1986). The jury heard the testimony of all the witnesses at trial, including the testimony elicited by the defendant on cross-examination, and rendered its verdict accordingly. It is not our function to determine if the jury properly evaluated the credibility of the confession narrated by Adams and the conversations narrated by

Shannon. Rather, it is our function to "review the evidence and construe it as favorably as possible with a view toward sustaining the conviction, and then [to] determine whether, in light of the evidence, the trier of fact could reasonably have reached the conclusion it did reach. *State* v. *Rossier,* 175 Conn. 204, 207, 397 A.2d 110 (1978)." *State* v. *McClary,* 207 Conn. 233, 249, 541 A.2d 96 (1988). We cannot say that, from the evidence presented, the jury could not reasonably have concluded that the defendant was guilty of murder beyond a reasonable doubt.

## IV

The defendant next claims that the trial court erred in admitting into evidence certain testimony given by Glenda Hightower. He claims that, depending upon the purpose for which it was offered, the testimony was either irrelevant or inadmissible hearsay. We agree, but conclude that the trial court's error in admitting the evidence was harmless.

During direct examination, Hightower was asked by the state where she had been and what she had been doing on May 14, 1981, the night before Littman's body was discovered. She began her response with, "Well, I had gotten a call and," but she was interrupted by the state, who cautioned her not to repeat anything that had been said to her in that telephone call. Hightower continued by explaining that she had gone to Adams' house on that night. When asked her reasons for going to Adams' house, Hightower explained that she had wanted to see the defendant to talk to him about money and to ask him where Littman was. Hightower said that she was concerned about Littman. The defendant objected when Hightower was asked why she had been concerned.

Out of the presence of the jury, Hightower testified that she had been concerned about Littman "because of the phone call and because I just felt that he was not safe" from the defendant and Herring. Responding to questions asked by defense counsel, Hightower said that her concern had been based on the phone call from a person named Concetta, and on her "own belief and something else too." The defendant argued that the admission was barred either on relevancy grounds or as inadmissible hearsay. The trial court ruled that it would allow the testimony to be admitted to show Hightower's state of mind. Consequently, in the presence of the jury, Hightower testified that she had gone to Adams' house to see the defendant due to her belief that Littman was going to be hurt and her concern for his safety.

Initially, we note that it is clear that the introduction of this testimony was intended to present to the jury the fact that, as a result of a telephone call, Hightower was concerned for Littman's safety and consequently went to Adams' house looking for the defendant. Although the actual words stated by the caller during the phone conversation were not repeated, the state presented to the jury by inference that the telephone caller had warned Hightower about Littman's peril. An out-of-court statement was thus presented to the jury. The question that must be answered, therefore, is: For what purpose was the state offering this out-of-court statement?

"It is an elementary premise of evidentiary law that a statement made out-of-court that is offered to establish the truth of the facts contained in the statement is hearsay. *State v. Silveira,* 198 Conn. 454, 473, 503 A.2d 599 (1986); *State v. Sharpe,* 195 Conn. 651, 661, 491 A.2d 345 (1985); C. Tait & J. LaPlante, Handbook of Connecticut Evidence (2d Ed. 1988) § 11.1.1. A statement that is offered to show its effect upon the hearer,

however, is not hearsay. *State* v. *Hull,* 210 Conn. 481, 499, 556 A.2d 154 (1989); *State* v. *Silveira,* supra; *State* v. *Zdanis,* 173 Conn. 189, 192 n.1, 377 A.2d 275 (1977)." *State* v. *John,* supra, 680. The substance of the phone call that was implicitly relayed to the jury would not have been hearsay if offered to show the effect it had had on Hightower. It still, however, would not have been admissible for that purpose. Evidence is only admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. *State* v. *McClendon,* 199 Conn. 5, 8, 505 A.2d 685 (1986). Hightower's conduct was not in issue and the fact that she went to Adams' house looking for the defendant did not tend to establish that the defendant was guilty of murder. The substance of the telephone call did tend to corroborate Hightower's earlier testimony that she had heard the defendant and Herring planning to kill Littman. The call was, however, corroborative only if the content of the call was being offered for the truth of the matter asserted, i.e., that Littman's life was in danger. For this purpose, it was inadmissible hearsay.

Although we find that the trial court erred in admitting this evidence, the question remains whether the error was harmful. The error in this case does not involve, and the defendant does not claim, a constitutional violation. " 'When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). The defendant must show that it is more probable than not that the erroneous action of the court affected the result. Id.; *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976).' *State* v. *Jones,* 205 Conn. 723, 732, 535 A.2d 808 (1988)." *State* v. *Vilalastra,* 207 Conn. 35, 47, 540 A.2d 42 (1988).

We conclude that the defendant has not shown that it was more probable than not that the erroneously admitted testimony of Hightower affected the result of the trial. Regardless of the purpose for which the testimony was offered and ultimately admitted, it was merely cumulative of other evidence presented. If the testimony was offered to show the effect the phone call had had on Hightower, it was cumulative of information that had already been provided the jury by the defendant. During cross-examination of T. J. Thomas, the defendant inquired if Thomas had ever talked to Glenda Hightower about the case. The following colloquy transpired:

"A. No, I didn't. No, I didn't.

"Q. Never once?

"A. No, not talk about the case to her. But I spoke—

"Q. Go ahead.

"A.—I spoke to her the morning that I seen her—the same morning they dropped the car off, I seen Glenda on Garden Street, on the corner of Garden and Edgewood. They were looking for this—what the boy name? The one that got killed. *They were looking for him to tell him that Boo and them were looking for him to kill him.*"[10] (Emphasis added.) If the testimony was offered to corroborate Hightower's earlier testimony, the testimony was necessarily cumulative of her narration of the conversation between Herring and the defendant in which they had discussed their plans for Littman's future. Accordingly, we conclude that the defendant has not shown that it is more probable than not that the erroneously admitted testimony affected the result.

---

[10] The defendant asked that this response be stricken, but the trial court denied his request stating, "You asked the question."

## V

The defendant's final claim is that our finding of error with respect to his prosecution for conspiracy to commit murder entitles him to a new trial on the murder charge. The defendant argues that had there been no conspiracy charge, "the jury would have had significantly less evidence before it and the Defendant might well have been acquitted." The defendant derives this conclusion from a remark made by the trial court, prior to the first witness being sworn, while explaining that he was reserving his decision concerning dismissal of the conspiracy count until the completion of the trial: "[I]f I charge out the [conspiracy] count, I'd have to charge out everything that's material to the [conspiracy] count." The state claims that ultimately the charging out of evidence as contemplated by the trial court was unnecessary in that all of the evidence admitted to prove a conspiracy was independently admissible to prove the murder. We agree.

The testimony of T. J. Thomas was admissible as testimony of an eyewitness to events directly in issue at the defendant's trial. The statements attributed to the defendant by Hightower, Adams and Shannon were admissible as admissions of a party-opponent relevant to show motive and intent on the murder charge. *State* v. *Stepney,* 191 Conn. 233, 251, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984); *State* v. *DeMatteo,* 186 Conn. 696, 702, 443 A.2d 915 (1982). Statements attributed to Herring, and made in the presence of the defendant and Hightower or Shannon were admissible, regardless of the conspiracy count, as adoptive admissions also relevant to show motive and intent. *State* v. *John,* supra, 682–85.

The defendant, in his brief and at oral argument, failed to pursue any claim that the above recited evidence was inadmissible on the murder charge. Rather,

his argument focused on the admission of the testimony of Hightower concerning the telephone call she had received the night before the discovery of Littman's body, discussed in the previous section. He argues that this testimony was concerned only with the conspiracy to commit murder charge, and if that charge should have been dismissed, the evidence should never have been presented to the jury. As we have concluded above, this testimony was erroneously admitted. We, however, incorporate our previous discussion concerning the harmlessness of its admission. Accordingly, since the defendant has not shown that it is more probable than not that this testimony affected the jury verdict on the murder charge, he is not entitled to a new trial on that charge.

There is error in part, the judgment of conviction on the charge of conspiracy to commit murder is set aside and the case is remanded with direction to render judgment dismissing that charge.[11]

In this opinion PETERS, C. J., HEALEY and CALLAHAN, Js., concurred.

COVELLO, J., dissenting. I disagree that the acquittal of the sole coconspirator in a separate trial foreclosed, as a matter of law, the prosecution of this defendant for conspiracy in a later trial. The earlier determination in *State* v. *Grullon,* 212 Conn. 195, 562 A.2d 481 (1989), that General Statutes § 53a-48 is a "bilateral" conspiracy statute does not offer any real insight in addressing the present issue. Nor does the line of cases holding that the acquittal of one conspirator forecloses the conviction of other conspirators found guilty in the same trial. This rule, while making obvious sense in the context of a single trial for all of

---

[11] In view of the fact that the defendant's ten to twenty year sentence on the conspiracy to commit murder charge was to run concurrently with his twenty-five years to life on the murder charge, resentencing of the defendant is unnecessary.

the reasons stated in the majority opinion, has been rejected by a number of jurisdictions where, as here, the acquittal occurs in a separate trial. See *United States* v. *Irvin,* 787 F.2d 1506, 1512–14 (11th Cir. 1986); *United States* v. *Roark,* 753 F.2d 991, 995–96 (11th Cir.), reh. denied, 761 F.2d 698 (11th Cir. 1985); *United States* v. *Espinosa-Cerpa,* 630 F.2d 328, 330–32 (5th Cir. 1980); *Gardner* v. *State,* 286 Md. 520, 524–29, 408 A.2d 1317 (1979); *Commonwealth* v. *Brown,* 473 Pa. 458, 463–67, 375 A.2d 331 (1977).

An earlier unsuccessful prosecution of an alleged coconspirator in a separate trial means nothing more than that on a given date the prosecution failed to meet its burden of proving the defendant guilty beyond a reasonable doubt of all of the elements constituting conspiracy. It certainly does not mean as the majority now holds, that a conspiracy did not occur. "It has long been recognized that criminal juries in the United States are free to render 'not guilty' verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors. *Dunn* v. *United States,* 284 U.S. 390, 393–94, 52 S. Ct. 189, 190–191, 76 L. Ed. 2d 356 (1932). Consequently, an acquittal is not to be taken as the equivalent of a finding of the fact of innocence; nor does it necessarily even reflect a failure of proof on the part of the prosecution." *United States* v. *Espinosa-Cerpa,* supra, 332.

Suppose, for example, that a jury is satisfied that a conspiracy took place, but is not satisfied with the evidence that the person on trial has been properly identified as one of the conspirators. Failure to establish this element in the first trial will now serve to exonerate the other conspirator no matter how strong the proof is as to him. Suppose in the first trial, the alleged conspirator is found guilty. In a subsequent trial, however, all his coconspirators are found not guilty because the principal witness in the first trial is no longer available. Based on the majority's reasoning in this decision,

it only seems logical that the first conviction must now also be set aside.

Hereafter, in the prosecution of coconspirators at separate trials, should all but one of them be found not guilty for whatever the reason, the other also will now go free. I submit that such an outcome is neither legally nor logically correct. I would affirm the decision of the trial court in all respects.