## STATE OF CONNECTICUT *v.* JOSE COLON
## (SC 16413)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued April 27—officially released August 14, 2001

Richard E. Condon, Jr., special deputy assistant public defender, for the appellant (defendant).

Rita M. Shair, senior assistant state's attorney, with whom were John A. Connelly, state's attorney, and, on the brief, Robin Lipsky, assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. A jury found the defendant, Jose Colon, guilty of one count of murder in violation of General Statutes § 53a-54a (a)[1] and one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48[2] and 53a-54a (a). The trial court sentenced him to a term of imprisonment of fifty-five years on the murder conviction and twenty years on

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[2] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

the conspiracy conviction, to run concurrently, for a total effective sentence of fifty-five years. The defendant appealed from that judgment to the Appellate Court, claiming that the trial court improperly denied his motion for judgment of acquittal on the conspiracy conviction after his sole alleged coconspirator was acquitted of conspiracy in a separate, subsequent trial.[3] The defendant argued that this outcome was in direct conflict with *State* v. *Grullon*, 212 Conn. 195, 562 A.2d 481 (1989), and *State* v. *Robinson*, 213 Conn. 243, 567 A.2d 1173 (1989), both of which held that § 53a-48 is strictly a bilateral conspiracy statute. We transferred the appeal to this court pursuant to Practice Book § 65-1.[4] We now conclude that § 53a-48 (a) can be interpreted unilaterally in those cases in which alleged coconspirators are tried separately based on independent evidence of the crime of conspiracy.[5] Accordingly, the defendant's conviction is affirmed.

The jury reasonably could have found the following facts. Sergeant Michael Fischer of the Waterbury police department testified that on April 22, 1996, the Waterbury police received an anonymous telephone call alert-

---

[3] The defendant argued that he should have been acquitted when his coconspirator was acquitted *after* his conviction, but *before* his sentencing. The timing of the outcomes of these two cases is irrelevant for purposes of this appeal.

[4] Practice Book § 65-1 provides: "When, pursuant to General Statutes § 51-199 (c), the supreme court (1) transfers to itself a cause in the appellate court, or (2) transfers a cause or a class of causes from itself to the appellate court, the appellate clerk shall notify all parties and the clerk of the trial court that the appeal has been transferred. A case so transferred shall be entered upon the docket of the court to which it has been transferred. There shall be no fee on such transfer. The appellate clerk may require the parties to take such steps as may be necessary to make the appeal conform to the rules of the court to which it has been transferred, for example, supply the court with additional copies of the record and the briefs."

[5] We do not, however, overrule *State* v. *Grullon*, 212 Conn. 195, 562 A.2d 481 (1989), in which we held that a defendant cannot be guilty of conspiracy when the only other coconspirator is a police officer or agent who never actually intended that the illegally "agreed upon" activity occur.

ing them to a possible homicide at an abandoned building on Ridgewood Street in Waterbury. When the police arrived, they discovered the bloody body of the victim. The victim had been stabbed several times in the head, neck, arms and torso, and also appeared to have been beaten about the head. A metal pipe and a small buck knife covered in blood and hair were discovered at the crime scene. An autopsy conducted by Edward T. McDonough, the deputy chief medical examiner, revealed that the victim had approximately "125 . . . sharp force injuries . . . he had cuts and stabs over the head, the face, the front of the trunk, the back, and the arms and both legs." The victim also had on his arms, hands and wrists several cuts that were consistent with defensive injuries, as though he had been attempting to protect himself from the blows. The autopsy revealed that the wounds had been inflicted by the buck knife and the metal pipe discovered at the scene, and that another, much larger, weapon also had been used in the attack. Michael Silva, a forensic crime scene technician, described the victim's wounds as appearing to have been inflicted by a knife that was "large . . . approximately eight inches long with a fat blade with a brass type of guard to it."[6] Silva also testified that the "cast off" patterns of blood at the crime scene illustrated that the victim had suffered a "severe attack," that the "assailant was swinging very, very violently at the victim," and that the wall behind the victim showed signs of "actual misses . . . [that occurred when] the assailant swung the weapon . . . against the wall . . . ." He also testified that the hair pattern on the wall behind the victim indicated that he was struck several times in the head. It was the opinion of McDonough and Silva that, as a result of the combined sharp force injuries, the victim bled to death over a period of time.

---

[6] Additional witness interviews revealed that a large sword like a machete also had been used in the attack.

Lieutenant Michael Ricci of the Waterbury police department testified that on April 23, 1996, the day after the body was discovered, police officers began questioning local residents about the homicide. After being shown a police photograph, the victim's father identified the victim as his son, Hector Nieves. Once the victim was identified, Ricci and several other officers interviewed area residents in an effort to identify the individual who had made the anonymous call to the Waterbury police. Ricci interviewed Kevin Soto and his girlfriend, Edith Santos, who appeared to have been acquainted with the victim. Ricci requested that the couple come down to the police station the next day to listen to a recording of the unidentified 911 caller. While Soto was at the station, Ricci realized that it was his voice on the 911 tape. Soto then admitted making the call and, after being issued a *Miranda*[7] warning, disclosed his role in the crime and implicated the defendant as the principal actor. See *State* v. *Soto*, 59 Conn. App. 500, 502–503, 757 A.2d 1156, cert. denied, 254 Conn. 950, 762 A.2d 906 (2000).[8] Ricci testified that, after Soto's

[7] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[8] The Appellate Court opinion, in *State* v. *Soto*, supra, 59 Conn. App. 502–503, sets forth the relevant facts as follows: "On April 22, 1996, officers from the Waterbury police department were dispatched to 49 Ridgewood Street where they discovered the body of the victim, Hector Nieves, who had been stabbed and cut approximately 125 times. They had been directed to the scene by a 911 emergency telephone call made by a male caller who had identified himself only as 'Michael.' On the following day, the defendant, a friend of the victim, was interviewed, and he denied any knowledge of the murder. On the next day, after listening to the 911 tape, the defendant admitted that he had made the call and that the voice on the tape was his. . . . [T]he defendant named Jose Colon as the person who had committed the murder . . . [and] did not admit that he was present or that he had participated in the murder.

"Following Colon's questioning by the police, the police again spoke to the defendant and he admitted at that time that he had been present and had been involved in the murder. Thereafter, the defendant gave a signed written statement wherein he described how he and Colon had only planned to scare the victim because the victim had disrespected both of them in public. He indicated that he had given his buck knife to Colon, who after

disclosure, several officers were dispatched to Kennedy high school in Waterbury to bring the defendant in for questioning. Shortly after his arrival, and after being issued a *Miranda* warning, the defendant admitted to the officers his participation in the murder.

Ricci testified that, after taking a written statement from the defendant, police officers spoke to Soto a second time about the homicide and also interviewed Santos. Santos gave the police two different statements regarding the events of that day, one before and one after the defendant was placed under arrest. Initially, Santos did not implicate the defendant in the murder. She testified at trial that, when she gave her first statement to the police, she had been afraid that the defendant was still out on the street. Once she knew the defendant was in custody, however, she disclosed to police everything she knew about the murder. Thus, during her second interview with the police, Santos disclosed that she was with Soto at his mother's residence on the day of the murder. She observed Soto leave the residence with the victim and then return about one half hour later. Santos told the police that, when Soto returned to his mother's home after spending time with the defendant, he was acting strangely. When she asked what was wrong, Soto revealed to her that he and the defendant had stabbed the victim. Soto then told Santos that they had to go to her apartment because the defendant was there. When Santos arrived at her apartment and saw the defendant, she could see that he was "full of blood from head to toe." The defendant took a large "sword" out of his sleeve and showed it

waving it around, gave it back to him. The defendant then cut Nieves on the side of the neck. At trial, the defendant testified that they had been smoking marijuana and had cut the victim on the neck, but that Colon had pulled out a big knife, which was an antique Pakistani sword, and began stabbing Nieves, at which time the defendant left. The defendant then went to the house of his girlfriend, Edith Santos, and told her that Colon had just killed Nieves."

to her. It also was covered in blood. Santos got the defendant a garbage bag for his bloody clothes, while he showered and changed into clean clothes. Santos testified that, after speaking with Soto, she asked the defendant if the victim was dead and he responded affirmatively. Santos then testified that she, Soto and the defendant left her apartment, and the defendant deposited the bag of bloody clothes behind an abandoned building. When Soto and Santos parted ways with the defendant, they decided to call 911.

Two additional witnesses provided information on the "large sword" Santos described in her statement to the police. Ivan Pagan testified that, on the day of the murder, the defendant came to his house and took a "Pakistani sword" that he was holding for a relative. Ivan Pagan testified that the defendant returned approximately one hour later, in different clothes, and gave the sword back to him with a dent in the tip, covered in fresh blood and hair. The defendant told Ivan Pagan that "he [had] killed [Hector from] up the street." Ivan Pagan took the sword, cleaned it with alcohol and a rag, wrapped it in tape and placed it in his closet. Later that evening, he hid the sword "on the roof by the side of [his] house" covered in branches. Ivan Pagan testified that his fear of the defendant prompted him to take the sword and hide it for him as instructed. Danny Pagan, Ivan Pagan's brother, testified that he saw the defendant speak to Ivan Pagan on April 22, 1996. He testified that he observed the defendant meet Soto up the street, and then place the "Pakistani knife" in his pants.[9] When Danny Pagan asked the defendant where he was going, the defendant answered that he was going up the block "on a mission" with Soto.[10] Later that day, Danny Pagan

---

[9] Danny Pagan also described the knife as long, with teeth on one side and a sharp blade on the other.

[10] In the trial court's memorandum of decision on Soto's postverdict motions; *State* v. *Soto*, Superior Court, judicial district of Waterbury, Docket No. CR4-247755 (January 20, 1999); the court pointed out that the defendant's statement about going "on a mission" was inadmissible at Soto's trial.

saw the defendant return to their neighborhood and speak to his brother. Ivan Pagan later told Danny Pagan that the defendant revealed to him that he had killed the victim. The next day, Danny Pagan saw the defendant speak to the police and deny that he was "Cujo," a name the police had learned the defendant was called on the street. After speaking with the police, the defendant approached Danny Pagan and told him that he and Soto had killed somebody with the sword, and he instructed Danny Pagan to move it from its initial hiding place. Danny Pagan testified that after his conversation with the defendant, he moved the sword from the roof where his brother had hidden it, wrapped it in a black plastic bag and placed it in a nearby abandoned garage.

Mark Deal, a Waterbury police officer, took a statement from the defendant that was read into the record at trial. In his statement, the defendant stated that he met Soto on Hillside Avenue in Waterbury on April 22, 1996. Soto, a member of the Latin Kings gang, told the defendant that the victim had "disrespected the [Latin Kings] nation" and that they had to "work him over." The defendant stated that he and Soto approached the victim and asked him if he wanted to smoke a "blunt," or a marijuana cigarette, in an abandoned building on Ridgewood Street. The defendant walked into the building before Soto and the victim, but turned around when he heard the victim say, "Oh Kevin, why did you do that?" The defendant stated that when he turned around, the victim was holding his throat. When the victim took his hand away, the defendant stated that he saw a lot of blood coming from the victim's throat. Soto had pushed the victim to the floor and shut the door. The defendant then stated that Soto passed him the knife and he stabbed the victim in the chest. When the victim resisted the attack, the defendant punched him and swung at him with the knife, while Soto beat him with a long metal bar. The defendant stated that

he remembered stabbing the victim approximately five times before Soto said "let's get out of here." The defendant stated that the victim was still moving when they left him. After the defendant and Soto left the scene, they went to the home of Santos where they cleaned the victim's blood off themselves and changed their clothes. In his statement, the defendant identified Soto as the other participant in the killing and described the murder weapon and the clothing he wore the night of the murder.

The jury began deliberations on October 26, 1998. On October 27, 1998, the jury returned a verdict of guilty on all charges. At the sentencing phase of the trial, the defendant filed a postverdict motion for judgment of acquittal on the conspiracy charges because his sole alleged coconspirator had been acquitted of conspiracy in a separate trial after the defendant's conviction but prior to his sentencing. See *State* v. *Soto*, supra, 59 Conn. App. 502 n.2. The defendant relied upon *State* v. *Grullon*, supra, 212 Conn. 195, and *State* v. *Robinson*, supra, 213 Conn. 243, for his argument that, as a matter of law, a defendant cannot be guilty of conspiracy to commit a crime when his sole alleged coconspirator has been acquitted of conspiracy charges stemming from the same crime. The defendant argued that, because his sole alleged coconspirator, Soto, was tried on the same charges, based on identical underlying facts, and acquitted by a jury of the charge of conspiracy to commit murder prior to the defendant's sentencing, he also must be acquitted of the conspiracy charges.[11]

---

[11] Defense counsel argued that "[t]he . . . philosophy . . . behind the *Robinson* decision is that . . . our conspiracy statute is bilateral as was held in *Grullon*. . . . [I]f there [are] only two coconspirators . . . as there [were] in this case, which I think the evidence is clear that it was [the defendant] and Mr. Soto . . . if one or the other is acquitted after trial, it's a finding on [the] merits; and as a matter of law, then there is no conspiracy because as the case law indicated, you can't have one hand clapping. It's not a unilateral situation, it's a bilateral situation . . . ."

The defendant asserted that, because Connecticut's conspiracy statute requires bilateral agreement, the acquittal of one conspirator necessarily precludes the conviction of the sole alleged coconspirator.[12] The trial court disagreed.

Finding *Robinson* to be factually distinguishable from the present case, the trial court made the following finding: "The court feels the factual pattern here is unlike . . . *Robinson*. I think that the fact pattern here triggers the case law that allow[s] inconsistent verdicts at separate trials. I don't believe it is the policy of the state or the law of the state to undo serious convictions based upon what another jury does in subsequent cases on somewhat different evidence that was presented to that jury." The trial court went on to state: "In fact, the Court's recollection . . . [is] that when the two met to gather the sword to move on . . . the evidence against [the defendant] said that they were 'going on a mission,' which the jury in [this] case could have interpreted to be a conspiracy. That evidence, my recollection [is], was absent in the case of Mr. Soto, so that two juries, one subsequent to the other, [heard] different evidence, allow[ing] inconsistent verdicts." Accordingly, the trial court denied the defendant's motion for judgment of acquittal. We agree with the trial court's reasoning.

General Statutes § 53a-48 (a) provides that "[a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits

---

[12] The defendant recognized that the timing in *Robinson* was different in that there was an acquittal of the first alleged coconspirator, and therefore the prosecution of the second individual was barred. *State* v. *Robinson*, supra, 213 Conn. 253. He went on to argue, however, that "[i]t doesn't matter who's convicted first," relying on *Evans* v. *Commissioner of Correction*, 47 Conn. App. 773, 709 A.2d 1136, cert. denied, 244 Conn. 921, 714 A.2d 5 (1998).

an overt act in pursuance of such conspiracy. . . ."[13] Generally, "[i]n construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *State* v. *Parra*, 251 Conn. 617, 622, 741 A.2d 902 (1999). In *Grullon* and *Robinson*, we determined that the language of § 53a-48 (a) supported a bilateral interpretation of our conspiracy laws. *State* v. *Grullon*, supra, 212 Conn. 195; *State* v. *Robinson*, supra, 213 Conn. 243. "Our examination of the definition of the crime of conspiracy in § 53a-48 convince[d] us that the legislature [had] determined that conspiracy require[d] a showing that two or more coconspirators intended to engage in or cause conduct that constitute[d] a crime." (Internal quotation marks omitted.) *State* v. *Robinson*, supra, 250.

In arguing that he could not be convicted of conspiracy once Soto, his sole alleged coconspirator, was acquitted, the defendant relied upon *State* v. *Grullon*, supra, 212 Conn. 195, and *State* v. *Robinson*, supra, 213

---

[13] The judge instructed the jury on the conspiracy charge as follows: "A person is guilty of conspiracy when with the intent that conduct constituting a crime be performed . . . here murder, he agrees with one or more persons to engage in or cause the performance of such conduct and any one of them commits an overt act in the pursuance of the conspiracy. To constitute the crime of conspiracy, the state must prove the following elements beyond a reasonable doubt: (1) There was an agreement between the defendant and one or more persons to engage in conduct constituting a crime; (2) there was an overt act in furtherance of the subject of the agreement by one of the persons; (3) there was the intent on the part of the defendant that conduct constituting a crime be performed. . . . [W]hat is important is whether the defendant willfully participated in the activities of the conspiracy with knowledge of its illegal ends."

Conn. 243. We now conclude, however, that *Grullon* and *Robinson* are factually distinguishable from one another and, therefore, that the rule in *Grullon* should not have governed our decision in *Robinson*.[14] In *Grullon*, we concluded that a defendant could not be guilty of conspiracy pursuant to § 53a-48 without proof beyond a reasonable doubt that he conspired with another individual who was not a police informant or agent because the statute requires that there be an agreement between coconspirators. *State* v. *Grullon*, supra, 198–99. In *Grullon*, the defendant had conspired with a police agent to deliver a shipment of narcotics. The agent did not have the actual intent to commit the crime. Id., 203–204. In *Robinson*, however, the defendant and his coconspirator both were charged with conspiracy to commit murder and both went to trial in different proceedings. *State* v. *Robinson*, supra, 250. The defendant was convicted on the conspiracy charge, but his coconspirator was acquitted. Id. Relying on the *Grullon* requirement for bilateral conspiracy, we concluded that the acquittal, at a separate trial, of the defendant's alleged coconspirator foreclosed prosecution of the defendant for conspiracy because the culpability of the coconspirator was "an essential element of the defendant's offense." Id., 253.

On the basis of their significant factual differences, however, we now conclude that our reliance on *Grullon* in deciding *Robinson* was improper. "The earlier deter-

---

[14] Indeed, the legislature has taken no action since the publication of our decisions in *Grullon* and *Robinson*, both of which interpreted § 53a-48 as a bilateral conspiracy statute. However, "legislative inaction is not necessarily legislative affirmation . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 262–63, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). The legislature's failure to challenge either decision is not dispositive of the issue, however, because "even legislative inaction is not the best of guides to legislative intent." (Internal quotation marks omitted.) *Streitweiser* v. *Middlesex Mutual Assurance Co.*, 219 Conn. 371, 379, 593 A.2d 498 (1991).

mination in . . . *Grullon* . . . that General Statutes § 53a-48 is a 'bilateral' conspiracy statute does not offer any real insight in addressing the present issue. Nor does the line of cases holding that the acquittal of one conspirator forecloses the conviction of other conspirators found guilty in the same trial. This rule, while making obvious sense in the context of a single trial for all of the reasons stated in the majority opinion, has been rejected by a number of jurisdictions where, as here, the acquittal occurs in a separate trial. See *United States* v. *Irvin*, 787 F.2d 1506, 1512-14 (11th Cir. 1986); *United States* v. *Roark*, 753 F.2d 991, 995-96 (11th Cir.), reh. denied, 761 F.2d 698 (11th Cir. 1985); *United States* v. *Espinosa-Cerpa*, 630 F.2d 328, 330–32 (5th Cir. 1980); *Gardner* v. *State*, 286 Md. 520, 524–29, 408 A.2d 1317 (1979); *Commonwealth* v. *Brown*, 473 Pa. 458, 463–67, 375 A.2d 331 (1977)." *State* v. *Robinson*, supra, 213 Conn. 262–63 (*Covello, J.*, dissenting).

In *Grullon*, the police agent never intended to commit the underlying crime and, therefore, there was no agreement as required by the statute. *State* v. *Grullon*, supra, 212 Conn. 203. In *Robinson*, however, the coconspirators were both charged with the underlying, substantive crime of conspiracy, and both coconspirators were charged with having the underlying necessary intent to enter into the conspiracy. *State* v. *Robinson*, supra, 213 Conn. 250. Thus, although we recognize that "[t]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it"; (internal quotation marks omitted) *State* v. *Murray*, 254 Conn. 472, 499, 757 A.2d 578 (2000) (*McDonald, C. J.*, dissenting); it is evident that the facts of these two cases warrant different results and *Robinson* should be overruled. We noted in *Grullon* that "[a]llowing a government agent to form a conspiracy with only one other party would create the potential for law enforce-

ment officers to manufacture conspiracies when none would exist absent the government's presence." (Internal quotation marks omitted.) *State* v. *Grullon*, supra, 203. We reaffirm that principle and decline to overrule *Grullon*.[15] For the following reasons, however, we con-

[15] Several jurisdictions disagree with our holding in *Grullon*. In *People* v. *Schwimmer*, 66 App. Div. 2d 91, 92, 411 N.Y.S.2d 922 (1978), cert. denied, 47 N.Y.2d 1004, 394 N.E.2d 288, 420 N.Y.S.2d 218 (1979), the New York Appellate Division decided that a defendant could be convicted of conspiracy when all the other members of the alleged conspiracy feigned agreement and never intended to perform the object crime. In *Schwimmer*, the defendant conspired with an undercover New York City police officer and a confidential police informant to illegally sell diamonds owned by the city of New York. The defendant argued that he could not be guilty of conspiracy because his two coconspirators never intended to commit the underlying substantive crimes. Id., 93. He argued that his coconspirators' lack of intent rendered a finding of "conspiratorial agreement" impossible and, therefore, that he must be acquitted of the conspiracy charges. Id. The New York Appellate Division disagreed and adopted the " 'unilateral approach' exemplified by the [revised] Model Penal Code (10 Uniform Laws Ann., §§ 5.03, 5.04)." Id.; see also *People* v. *Villetto*, 47 N.Y.2d 1006, 394 N.E.2d 288, 420 N.Y.S.2d 219 (1979); *People* v. *Teeter*, 47 N.Y.2d 1002, 394 N.E.2d 286, 420 N.Y.S.2d 217 (1979). Other states have followed suit. See *State* v. *Chan*, 188 Ariz. 272, 274, 935 P.2d 850 (1997) ("person may be guilty of conspiracy even if other person in plot is police agent who has no real intention of committing criminal act"); *State* v. *Null*, 247 Neb. 192, 203, 526 N.W.2d 220 (1995) ("consequence of the unilateral approach to make it immaterial to the guilt of a conspirator whose culpability has been established that the other person . . . with whom he conspired [has] not been or cannot be convicted"); *State* v. *Sample*, 215 Wis. 2d 487, 501–505, 573 N.W.2d 187 (1998) (coconspirator's feigned agreement with defendant sufficient to support charge for "inchoate crime of conspiracy"). "Other states have justified the unilateral theory of conspiracy as sound public policy [based on reasoning similar to that of *Schwimmer*]. A person who believes he is conspiring with another to commit a crime is a danger to the public regardless of whether the other person in fact has agreed to commit the crime." *Miller* v. *State*, 955 P.2d 892, 897 (Wyo. 1998).

We note, however, as we did in *Grullon*, that "[a]lthough much of the language of the New York and Connecticut statutes is virtually identical, the New York statute contains a section, not contained in the Connecticut statute, that specifically states that it is not a defense to a conspiracy charge that the defendant's coconspirator lacked the mental state necessary to himself be guilty of conspiracy." *State* v. *Grullon*, supra, 212 Conn. 201. Because the holding in *Schwimmer* hinges on that section, we are not persuaded by the decision in *Schwimmer* as it pertains to cases in which

clude that the rule in *Robinson*, although "once believed sound, needs modification to serve justice better. . . . [This] court, when once convinced that it is in error, is not compelled to follow precedent." (Internal quotation marks omitted.) *George* v. *Ericson*, 250 Conn. 312, 318, 736 A.2d 889 (1999). We now conclude, therefore, that the conviction of a conspirator may be upheld despite the acquittal of his sole alleged coconspirator in a separate trial where there is sufficient evidence to prove, beyond a reasonable doubt, that the defendant was guilty of conspiracy.[16]

In *Robinson*, we held that, "as a matter of law, the conspiracy charge against the defendant was barred after the acquittal of the sole alleged coconspirator." *State* v. *Robinson*, supra, 213 Conn. 253. We enumerated therein those jurisdictions that had taken a similar position. Id., 253 n.8. We also recognized, however, that authorities are split over whether criminal liability under conspiracy laws should be extended to situations where a defendant's coconspirator has been acquitted in a prior trial before a different jury. Id., 251–52, citing annot., 19 A.L.R.4th 192, and cases cited therein. The courts that find liability in such cases have reasoned that "an acquittal is not tantamount to a determination of innocence and that the proof may differ from one trial to another. Central to that reasoning of these courts is their contention that consistent verdicts, even as to conspiracy convictions, are not required at separate

the underlying conspiracy charge arose out of a police officer or agent's feigned agreement to commit a crime.

[16] As previously noted, this conclusion does not alter our analysis in *Grullon*, in which we held that there must be " 'at least one bona fide coconspirator' " in order for there to be an underlying substantive charge of conspiracy. *State* v. *Grullon*, supra, 212 Conn. 203. Thus, a defendant's agreement with a police officer or police agent to commit a crime does not satisfy the requirement in § 53a-48 that there be some other person, with culpable intent, who agrees with the defendant to violate the law. Id.

trials." Id., 252. We now consider the rationale of those jurisdictions persuasive.[17]

When coconspirators are tried separately, the acquittal of one on charges of conspiracy should not dictate the acquittal of the other simply because the state in one case has failed to prove an element necessary to a conspiracy charge. See *United States* v. *Espinosa-Cerpa,* supra, 630 F.2d 332 (jury's acquittal of some coconspirators should not be taken to negate fact of possible criminal complicity with any remaining alleged coconspirators); *People* v. *Berkowitz,* 50 N.Y.2d 333, 346, 406 N.E.2d 783, 428 N.Y.S.2d 927 (1980) (principles of collateral estoppel do not bar prosecution of one conspirator after acquittal of sole coconspirator in criminal trial). The acquittal of a codefendant in a separate trial "could . . . [result] from a multiplicity of factors completely unrelated to the actual existence of a conspiracy"; *United States* v. *Strother,* 458 F.2d 424, 426 (5th Cir.), cert. denied, 409 U.S. 1011, 93 S. Ct. 456, 34 L. Ed. 2d 305 (1972); for example, certain evidentiary issues that might render evidence inadmissible in one trial but not in another. See *Rosencrans* v. *United States,* 378 F.2d 561, 567 (5th Cir. 1967); *Marquiz* v. *People,* 726 P.2d 1105, 1107 (Colo. 1986). In separate trials, "[t]he evidence presented to the juries and the manner in which that evidence is presented may be significantly different and certainly will never be identical." *Marquiz* v. *People,* supra, 1107. As a result, "[d]ifferent juries may rationally come to different conclusions, especially when differing evidence is presented." *United States* v. *Roark,* supra, 753 F.2d 995.

[17] Our analysis of § 53a-48 (b) indicates that even when a conspirator successfully thwarts a conspiracy and has a defense to the charge, it does not negate the intent and the guilt of the alleged coconspirator. It is evident, therefore, that it was not the intention of the legislature universally to discharge the guilt of a sole conspirator when, for some evidentiary or procedural reason, his coconspirator is acquitted.

"An . . . unsuccessful prosecution of an alleged coconspirator in a separate trial means nothing more than that on a given date the prosecution failed to meet its burden of proving the defendant guilty beyond a reasonable doubt of all of the elements constituting conspiracy. It certainly does not mean . . . that a conspiracy did not occur. It has long been recognized that criminal juries in the United States are free to render not guilty verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors." (Internal quotation marks omitted.) *State v. Robinson*, supra, 213 Conn. 263 (*Covello, J.*, dissenting), citing *Dunn v. United States*, 284 U.S. 390, 393–94, 52 S. Ct. 189, 76 L. Ed. 356 (1932). "Consequently, an acquittal is not to be taken as the equivalent of a finding of the fact of innocence; nor does it necessarily even reflect a failure of proof on the part of the prosecution." (Internal quotation marks omitted.) *State v. Robinson*, supra, 263 (*Covello, J.*, dissenting), quoting *United States v. Espinosa-Cerpa*, supra, 630 F.2d 332. We reject the rule established in *Robinson* that one conspirator cannot be convicted when his sole alleged coconspirator is acquitted in a separate proceeding. We recognize that "[w]hile symmetry of results may be intellectually satisfying, it is not required." (Internal quotation marks omitted.) *United States v. Roark*, supra, 753 F.2d 996, quoting *Standefer v. United States*, 447 U.S. 10, 25, 100 S. Ct. 1999, 64 L. Ed. 2d 689 (1980).

The defendant in this case was tried and convicted by a jury that was presented with a specific body of facts, some of which were not presented in Soto's trial. For example, the jury in this case heard testimony of the "mission" upon which the defendant and his coconspirator embarked when they conspired to murder the victim. That evidence was inadmissible at the trial of the defendant's coconspirator, which may have been a factor in his acquittal on the conspiracy charge. The

acquittal of the defendant's coconspirator did not nullify the defendant's conviction of the same charge, where the two defendants were tried separately, and their respective juries were presented with separate, independent evidence of their agreement to commit the crime in question. Accordingly, we conclude that the trial court properly concluded that the defendant's conviction should stand despite Soto's acquittal and, therefore, that it properly denied the defendant's motion for judgment of acquittal.

The judgment is affirmed.

In this opinion the other justices concurred.