354 Conn. 181　　FEBRUARY, 2026　　181

Moon *v.* Commissioner of Correction

# RASHAD MOON *v.* COMMISSIONER OF CORRECTION
## (SC 21069)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Dannehy and Bright, Js.

*Syllabus*

The petitioner, who had been convicted of felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree in connection with the shooting death of the victim, sought a writ of habeas corpus, claiming, inter alia, that newly discovered evidence established that he was actually innocent of those crimes. At his habeas trial, the petitioner introduced evidence that, after he was convicted, M, his alleged coconspirator, was separately tried and found not guilty of conspiracy to commit first degree robbery, among other offenses, under the statute (§ 53a-13 (a)) governing the affirmative defense of lack of capacity due to mental disease or defect. The petitioner claimed that M's acquittal under § 53a-13 (a) established that M necessarily lacked the requisite intent to enter into a conspiracy with the petitioner and that M's inability to form an intent to commit any crime at the time of the shooting established the petitioner's actual innocence of each crime of which he was convicted. Relying on *State* v. *Colon* (257 Conn. 587), in which this court held that separately tried coconspirators are not entitled to consistent verdicts, the habeas court rejected the petitioner's actual innocence claim, reasoning that M's acquittal was, as a matter of law, irrelevant to whether the petitioner was actually innocent. Accordingly, the habeas court rendered judgment denying the petitioner's habeas petition. The petitioner then appealed to the Appellate Court, which affirmed the habeas court's judgment. The Appellate Court concluded that the habeas court had misapplied *Colon* and failed to evaluate the aggregate evidence from the petitioner's and M's separate criminal trials. After conducting its own independent review of that evidence, the Appellate Court also concluded that M's acquittal demonstrated that M was incapable of forming the necessary criminal intent to enter into the conspiracy, and M's inability to form a criminal intent necessarily meant that the petitioner was actually innocent of conspiring with M to commit the robbery. Nevertheless, the Appellate Court determined that the evidence permitted a reasonable fact finder to find that a conspiracy to commit the robbery existed between the petitioner and a third individual, which served as the alternative basis for affirmance of the habeas court's judgment. On the granting of certification, the petitioner appealed to this court. *Held*:

Although the Appellate Court applied the correct legal standard in evaluating the petitioner's actual innocence claim, it incorrectly concluded that M's acquittal under § 53a-13 (a) demonstrated that M could not have possessed the specific intent required to form a conspiratorial agreement with the petitioner.

This court agreed with the Appellate Court that this court's holding in *Colon* permitting inconsistent verdicts between separately tried alleged coconspirators is not applicable in the context of a habeas petition asserting

Moon *v.* Commissioner of Correction

an actual innocence claim, and that applying *Colon* to an actual innocence claim deprives a petitioner of the opportunity to prove his claim of innocence.

In support of an actual innocence claim, a petitioner may rely on evidence from his alleged coconspirator's separate criminal trial, including evidence that the alleged coconspirator lacked the requisite intent to enter into the conspiracy, if that evidence was not available to the petitioner at his own criminal trial, and the habeas court in the present case should have considered all of the evidence presented by the petitioner at his habeas trial to determine whether, in the aggregate, it established his actual innocence.

Nevertheless, neither the judgment of not guilty by reason of mental disease or defect in M's criminal case, nor the evidence from M's criminal trial that was submitted at the petitioner's habeas trial, supported the Appellate Court's conclusion that M's acquittal had demonstrated that M was incapable of forming the specific intent to conspire with the petitioner to commit the robbery.

The trial court in M's criminal case found that M had proven by a preponderance of the evidence that he lacked the capacity to appreciate the wrongfulness of his conduct and to conform his behavior to the requirements of the law, but it was the petitioner's burden in the present habeas proceeding to establish his actual innocence by clear and convincing evidence, and the trial court's finding in M's criminal case, which was reached under the less burdensome standard of preponderance of the evidence, could not be treated as clear and convincing proof in the petitioner's habeas proceeding that M lacked the specific intent necessary to conspire with the petitioner.

Moreover, a finding of not guilty under §53a-13 (a) means only that, at the time of an acquittee's conduct, the acquittee lacked substantial capacity to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law, and such a finding does not necessarily address whether the acquittee intended that conduct or necessarily equate with a finding that the acquittee lacked the specific intent to engage in the conduct.

Whether a finding under §53a-13 (a) that an acquittee lacked the capacity to appreciate the wrongfulness of his conduct bears on the acquittee's capacity to form a specific intent is a fact dependent inquiry that turns on the evidence of the nature and extent of the acquittee's particular mental disease or defect, because, in some cases, the acquittee may fully intend the criminal conduct but, due to his mental disease or defect, lack the capacity to appreciate its wrongfulness, such that the mental impairment alters only the acquittee's moral or evaluative understanding of his conduct but not his ability to form a specific criminal intent, whereas, in other cases, the acquittee's mental impairment may so distort his perception of reality that it may negate the formulation of criminal intent.

During M's criminal trial, the expert testimony established only that, as a result of his impairment, M lacked the substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law, not that M was unable to form the specific intent to commit the charged offenses.

Moreover, M's symptoms, including hallucinations and paranoid and persecutory delusions, could indicate either an impairment that excuses an intentional act or one that may undermine the formation of intent.

354 Conn. 181 FEBRUARY, 2026 183

Moon *v.* Commissioner of Correction

Accordingly, the evidence in the aggregate was insufficient for this court to determine whether M's mental impairment altered only his moral or evaluative understanding of his conduct or whether it negated his ability to formulate specific criminal intent.

Because the newly discovered evidence of M's acquittal under §53a-13 (a) did not clearly and convincingly establish that M's impairment negated the specific intent required for conspiracy to commit robbery, the petitioner's actual innocence claim failed, and this court affirmed the Appellate Court's judgment on that alternative ground.

Argued October 27, 2025—officially released February 17, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; judgment denying the petition; thereafter, the court, *Newson, J.*, denied the petition for certification to appeal, and the petitioner appealed to the Appellate Court, *Elgo*, *Suarez* and *Keller*, *Js.*, which affirmed the habeas court's judgment, and the petitioner, on the granting of certification, appealed to this court. *Affirmed*.

*Naomi T. Fetterman*, assigned counsel, for the appellant (petitioner).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Angela R. Macchiarulo*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

BRIGHT, J. In this certified appeal, we consider whether the petitioner, Rashad Moon, established his actual innocence of conspiracy to commit robbery in the first degree based on newly discovered evidence arising from the separate trial of his alleged coconspirator, Marvin Mathis, who was found not guilty by reason of mental disease or defect under General Statutes §53a-13 (a). The habeas court rejected the petitioner's actual innocence claim, reasoning that the verdict in Mathis' case was, as a matter of law, irrelevant with respect to

whether the petitioner was actually innocent. The Appellate Court disagreed, concluding that Mathis' acquittal demonstrated that he was incapable of forming the necessary criminal intent to enter into the conspiracy to commit the robbery. See *Moon* v. *Commissioner of Correction*, 227 Conn. App. 838, 866–67, 322 A.3d 427 (2024). The Appellate Court reasoned that, because a conspiracy requires that both alleged conspirators possess the intent to engage in criminal conduct, Mathis' lack of intent necessarily meant that the petitioner was actually innocent of conspiring with Mathis to commit the robbery. See id. Nevertheless, the Appellate Court affirmed the judgment of the habeas court on the ground that the evidence permitted a reasonable fact finder to find a conspiracy to commit the robbery between the petitioner and a third person, Jahvon Thompson. See id., 873–75. The petitioner then sought certification to appeal to this court, asking us to review the Appellate Court's reliance on the purported conspiracy with Thompson. According to the petitioner, such reliance was improper because the state's theory of the case was and always has been that the petitioner conspired solely with Mathis to commit the robbery. We granted the petitioner's petition for certification to appeal, limited to the following question: "Did the Appellate Court correctly conclude that the habeas court had properly determined that the petitioner failed to meet his burden of proving that he was actually innocent of the crime of conspiracy to commit robbery in the first degree?" *Moon* v. *Commissioner of Correction*, 350 Conn. 918, 325 A.3d 216 (2024).

We answer the certified question in the affirmative. We do not, however, reach the question of whether the Appellate Court properly rejected the petitioner's actual innocence claim based on the petitioner's purported conspiracy with Thompson because we agree with the respondent, the Commissioner of Correction, that the judgment stemming from Mathis' being found not guilty by reason of mental disease or defect and the evidence submitted in support thereof do not clearly and convincingly establish that he lacked the capacity to form

Moon *v.* Commissioner of Correction

the requisite intent to conspire with the petitioner. We therefore affirm the judgment of the Appellate Court, albeit on a different ground.

The opinion of the Appellate Court sets forth the relevant facts, as previously recounted by that court in the petitioner's criminal appeal. See *State* v. *Moon*, 192 Conn. App. 68, 217 A.3d 668 (2019), cert. denied, 334 Conn. 918, 222 A.3d 513 (2020). "In May, 2013, the victim, Felix DeJesus, and his fiancée posted two T-Mobile Springboard tablets for sale on Craigslist. The Craigslist posting stated that the tablets were being sold for $300 each or $500 for both of them and included the victim's phone number. On May 8, 2013, at approximately 7 p.m., a prospective buyer of the tablets called the victim. The prospective buyer said that he did not have a car and asked the victim to meet him in Hartford so that he could purchase the tablets. The victim agreed to travel to Hartford and, shortly after 7 p.m., the victim left his home in Cromwell with the tablets.

"At approximately 7:45 p.m., a resident of the neighborhood where the crime occurred, Gloria Therrien, observed the victim park his car in front of 16 Allendale Road. From inside her home, Therrien saw two men approach the car and stand at its driver's side window. One of the men spoke to the victim through the front driver's side window while the other man stood next to him. Therrien heard a gunshot and saw the two men run away from the car, using a cut through that connected Allendale Road to Catherine Street. Therrien then went outside and walked toward the victim's car. She observed that the car windows were open and that the victim was in the driver's seat of the car jerking . . . and gurgling. Therrien asked some children who were nearby to call 911 and report that someone had been shot.

"The police arrived at the scene at approximately 8 p.m. When Jeffrey Moody, an officer with the Hartford Police Department (department), arrived, he saw the victim's car and noticed that its engine was running and that the victim was inside. Moody approached the car and found

Moon *v.* Commissioner of Correction

the victim unresponsive. Thereafter, emergency services took the victim to Hartford Hospital, where he died of a single gunshot wound to the head at approximately 3:46 a.m.

"[Christopher] Reeder, a detective with the department, arrived at the scene at approximately 8:30 p.m., after the victim had been taken to Hartford Hospital. Reeder searched the interior of the victim's car and found a T-Mobile Springboard Tablet and a white Samsung cell phone. The police took possession of both items.

"On May 9, 2013, the police extracted data from the cell phone, which they determined had belonged to the victim. The data extracted from the cell phone included a series of text messages and phone calls between the victim and a cell phone number that belonged to Marvin Mathis, an individual who resided near the scene of the crime. Around the time of the murder, there were text messages between Mathis and the victim . . . which . . . instructed the victim to meet him at 16 Allendale Road.

"That same day, Reeder went to speak with Mathis at his home on Allendale Road. Mathis denied having any knowledge of the shooting and stated that he was asleep at home when the crime occurred. Mathis also stated that he was with the [petitioner] from approximately 6 to 7:30 p.m. on the night of the shooting and that while they were together, the [petitioner] borrowed his [cell] phone.

"Mathis allowed Reeder to view his cell phone and the text messages on the device. The text messages on Mathis' cell phone matched the text messages that the police had extracted from the victim's cell phone. Mathis, however, denied sending the messages and stated that the [petitioner] must have sent them. Reeder also observed that the call log on Mathis' cell phone revealed that, at approximately the time of the shooting, there were calls between Mathis and the [petitioner]. On May 8, 2013, there were calls between the [petitioner] and Mathis at 6:02, 7:51, 7:52 and 9:53 p.m.

"On May 12, 2013, Reeder spoke with the [petitioner] and the [petitioner's] girlfriend, Brittany Hegwood.

Moon *v.* Commissioner of Correction

Hegwood informed the police that, on the night of the shooting, she witnessed Mathis and the [petitioner] walk down Catherine Street toward Hillside [Avenue] together and that when the [petitioner] returned approximately five minutes later he stated, [Mathis] just shot somebody.

"The [petitioner] also provided the police with a statement in which he admitted that he was with Mathis on the night of the shooting and that he went with Mathis to meet the victim. The [petitioner] stated that Mathis told the [petitioner] that he was going to buy some stuff from the victim. The [petitioner] further stated that he stood approximately thirty feet away from the victim's car while Mathis spoke with the victim through the driver's side window. The [petitioner] stated that he looked away from Mathis and heard a gunshot, at which point he and Mathis ran away from the car to the [petitioner's] house on Catherine Street.

"As part of their investigation, the police obtained a search warrant for the [petitioner's] cell phone records. The [petitioner's] cell phone records revealed calls between the [petitioner] and a phone number belonging to . . . Thompson on May 10 and 14, 2013.

"On May 23, 2014, approximately one year after the shooting, Thompson, who was under arrest at the time, spoke with Reeder. Thompson informed Reeder that he and the [petitioner] initially had planned to rob the victim because they were broke. Thompson further stated that a day or two before the crime he, the [petitioner], and Mathis were together and that the [petitioner] was texting the victim on Mathis' phone. Thompson stated that he ultimately did not participate in the robbery because something came up.

"Additionally, in May, 2014, an individual by the name of Tyrell Hightower left three messages on a police tip line, in which he indicated that he had information about a homicide that had occurred on Allendale Road one year earlier. On June 2, 2014, Reeder met with Hightower at Hartford Correctional Center, where Hightower was

Moon *v.* Commissioner of Correction

incarcerated. During the meeting, Hightower informed Reeder that the [petitioner] had confessed to him that he and Mathis were involved in the murder of the victim. Hightower further stated that the [petitioner] had informed him that it was a robbery that went bad and that Mathis had shot the victim.

"In late June, 2014, the police arrested the [petitioner]. After a jury trial, the [petitioner] was convicted of felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree. The court sentenced the [petitioner] to a total effective sentence of forty-nine years of incarceration." (Internal quotation marks omitted.) Id., 71–74. The Appellate Court affirmed the judgment of conviction; id., 71, 101; and this court denied certification to appeal. *State* v. *Moon*, 334 Conn. 918, 222 A.3d 513 (2020).

In May, 2017, approximately six months after the petitioner's conviction, Mathis was tried separately for his involvement in the murder. He was charged with manslaughter in the first degree with a firearm, robbery in the first degree, and conspiracy to commit robbery in the first degree. The case was tried to the court, *Dewey, J.*, over two days. At the close of the state's case-in-chief, and after allowing the parties to present closing argument, the court expressly found that the state had sustained its burden of proving each charged offense beyond a reasonable doubt.[1] The court then acknowledged that Mathis had raised the affirmative defense of lack of capacity due to mental disease or defect and proceeded to hear evidence and argument in support of that defense. The court thereafter concluded that Mathis had met his burden of proving his affirmative defense, finding that he "lacked the capacity to appreciate the wrongfulness of his conduct and to conform his behavior to the requirements of the law." Accordingly, the court

---

[1] Defense counsel did not contest that the state had established the elements of the charged offenses and did not cross-examine the state's only witness, Detective Reeder. The prosecutor likewise did not challenge Mathis' evidence in support of his affirmative defense or provide any rebuttal.

354 Conn. 181 FEBRUARY, 2026 189

Moon *v.* Commissioner of Correction

rendered a judgment of not guilty by reason of mental disease or defect. Mathis then underwent a statutorily mandated evaluation, which was followed by a commitment hearing. See General Statutes § 17a-582 (a), (b) and (e) (1). After hearing testimony regarding the results of that evaluation, the court committed Mathis to maximum security at the Whiting Forensic Division of the Connecticut Valley Hospital under the jurisdiction of the Psychiatric Security Review Board for a period of eighty years.

The petitioner commenced this habeas action in March, 2018, as a self-represented party. After counsel was appointed to represent him, he filed the operative second amended petition in November, 2022, alleging that his criminal trial attorney had rendered ineffective assistance and that newly discovered evidence established his actual innocence of felony murder, conspiracy to commit robbery in the first degree, and robbery in the first degree.

The habeas court, *Newson, J.*, held a trial on November 7, 2022, at which the petitioner claimed that he was actually innocent of all three crimes because Mathis lacked the mental capacity to form the necessary criminal intent as to each. The petitioner argued that, in the absence of such criminal intent, Mathis could not legally have been a participant in the robbery or entered into a conspiracy with the petitioner, thereby negating essential elements of first degree robbery and conspiracy to commit that offense, and, in turn, negating the predicate felony required to sustain the felony murder conviction. In support of this claim, the petitioner introduced the transcripts from his own criminal trial and Mathis' separate criminal trial.

On November 25, 2022, the habeas court issued its decision, denying both counts of the petition. The court rejected the petitioner's claim of actual innocence, concluding that the judgment in Mathis' trial had no bearing on the petitioner's guilt because factual findings from a separate trial of one coconspirator cannot be

Moon *v.* Commissioner of Correction

inserted into another trial, and, thus, Mathis' acquittal did not constitute the clear and convincing evidence required to prove the petitioner's actual innocence, particularly when the acquittal undermined neither the evidence placing the petitioner at the scene nor the incriminating statements and messages linking him to the crimes. Relying on *State* v. *Colon*, 257 Conn. 587, 602–603, 778 A.2d 875 (2001), the habeas court explained that separately tried coconspirators are not entitled to consistent verdicts because each trial proceeds on its own evidentiary record; Mathis' verdict, therefore, established only that a different fact finder, considering different evidence, reached a different result—it did not foreclose the reasonable possibility that the petitioner had committed the crimes with which he was charged. Accordingly, the habeas court concluded that the petitioner had failed to meet his burden of proving actual innocence.

The petitioner sought certification to appeal from the denial of his habeas petition. The habeas court denied the request, and the petitioner appealed to the Appellate Court, claiming that the habeas court had abused its discretion in denying certification and further erred in rejecting his actual innocence claim. See *Moon* v. *Commissioner of Correction*, supra, 227 Conn. App. 847–48. The petitioner maintained that the later judgment of not guilty by reason of mental disease or defect in Mathis' trial demonstrated that Mathis necessarily lacked the requisite mens rea to enter into a conspiracy with the petitioner, and that Mathis' inability to form an intent to commit any crime at the time proves the petitioner's actual innocence of each crime of which he was convicted. Id., 848. He also argued that the habeas court misapplied *Colon* in rejecting this theory. Id. The respondent countered that the petitioner's actual innocence claim failed because substantial evidence supported his convictions and the petitioner did not produce affirmative proof that he did not commit the crimes of conviction. Id.

The Appellate Court concluded that the habeas court had abused its discretion in denying certification to

Moon *v.* Commissioner of Correction

appeal, reasoning that the petitioner's actual innocence claim raised issues "debatable among jurists of reason" and thus warranted appellate review. Id., 849–50. As to the merits, the Appellate Court first determined that the habeas court applied the incorrect legal standard in evaluating the petitioner's actual innocence claim by relying on *Colon* and failing to evaluate the aggregate evidence from both the petitioner's and Mathis' separate criminal trials. Id., 860–61.

After conducting its own independent review of that combined record; id., 864–66; the Appellate Court reasoned that the evidence from Mathis' trial clearly and convincingly established that Mathis lacked the mental capacity to form any criminal intent and, therefore, that no conspiracy between the petitioner and Mathis could have existed. Id., 866–67. However, the Appellate Court determined that the "aggregate evidence, if presented in a new trial, would not prevent a reasonable jury from finding, beyond a reasonable doubt, that the petitioner was guilty of a conspiracy, despite the evidence of Mathis' lack of mental capacity at the time of the homicide." Id., 873. The court concluded that there was substantial evidence that the petitioner had conspired with a third person, Thompson, to commit the robbery. Id., 873–75. On the basis of Reeder's testimony and Thompson's *Whelan*[2] statement introduced at the petitioner's criminal trial, "the jury reasonably could have found that Thompson was a willing coconspirator." Id., 874. Therefore, "even if evidence of Mathis' incapacity had been presented at the petitioner's criminal trial, there was still sufficient evidence from which the jury could find the petitioner guilty of conspiracy to commit robbery." Id.

In this certified appeal, the petitioner argues that the Appellate Court erred in relying on his purported conspiracy with Thompson because neither the state at the petitioner's criminal trial nor the respondent in this habeas case has ever claimed that the petitioner's

---

[2] *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

Moon *v.* Commissioner of Correction

conspiracy conviction was based on an agreement with Thompson. The petitioner argues that the state's theory of the case has always been that the alleged conspiracy for which he was tried was between him and Mathis. He concludes that, because the reasoning of the Appellate Court was otherwise sound, we should reverse the judgment of the Appellate Court and remand the case with direction that the habeas court grant his second amended habeas petition, vacate his conspiracy to commit first degree robbery conviction, and order a new trial.

In response, the respondent argues that the Appellate Court properly relied on the evidence of the conspiracy between the petitioner and Thompson. Alternatively, the respondent argues that the Appellate Court misapplied *Colon* and that the proper application of our holding in that case forecloses the petitioner's claim. Finally, the respondent argues that "Mathis' inability to appreciate the wrongfulness of his conduct or [to] control his conduct within the requirements of our criminal law is not tantamount to an inability to enter into an agreement or [to] form the requisite intent to rob the victim." We agree with the respondent's last argument and affirm the judgment of the Appellate Court on that basis.

I

A

A petitioner who seeks habeas corpus relief on the basis of a freestanding claim of actual innocence bears "a heavy burden . . . to establish that, notwithstanding his conviction, he is entitled to a new trial." (Internal quotation marks omitted.) *Gould* v. *Commissioner of Correction*, 301 Conn. 544, 567, 22 A.3d 1196 (2011). In *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 700 A.2d 1108 (1997), we set forth a two part test that the petitioner must satisfy to succeed on a claim of actual innocence. "First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas

354 Conn. 181          FEBRUARY, 2026          193

Moon *v.* Commissioner of Correction

corpus trial—he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime." Id., 747.

Whether the petitioner has proven actual innocence by clear and convincing evidence is a factual determination made by the habeas court that requires the reviewing court to undertake "an independent and scrupulous examination of the entire record" to determine whether the habeas court's conclusion as to the petitioner's actual innocence "is supported by substantial evidence." Id., 803. "[T]he clear and convincing evidence standard should operate as a weighty caution [on] the minds of all judges, and it [is not satisfied] whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) Id., 795. It requires evidence that "induces in the mind of the trier a reasonable belief that the facts asserted are *highly probably* true, that the probability that they are true or exist is *substantially greater* than the probability that they are false or do not exist." (Emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 794.

The second component of the *Miller* test presents a different inquiry. "Determining whether no reasonable fact finder, considering the entire body of evidence as the habeas court did, would find the petitioner guilty is either an application of law to the facts or a mixed question of law and fact to which a plenary standard of review applies." Id., 805. As we explained in *Miller*, "[a] habeas court is no better equipped than we are to make the probabilistic determination of whether, considering the evidence as the habeas court did, no reasonable fact finder would find the petitioner guilty. That type of determination does not depend on assessments of credibility of witnesses or of the inferences that are the most appropriate to be drawn from a body of evidence—assessments that are quintessentially [the] task for the

[fact finder] in a habeas proceeding." (Internal quotation marks omitted.) Id.

Finally, we have recognized that actual innocence—sometimes referred to as factual innocence—is distinct from legal innocence. See, e.g., *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 560. "Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt." Id., 560–61. Instead, actual innocence requires affirmative proof that might tend to establish that the petitioner could not have committed the crime, that a third party committed the crime, or that no crime occurred. See id., 561–63. The petitioner must therefore do more than expose deficiencies in the state's proof. See id., 560–61.

B

The petitioner was convicted under General Statutes § 53a-48 (a), which provides that "[a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." "Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 167, 869 A.2d 192 (2005).

We have explained that § 53a-48 is a bilateral conspiracy statute that requires a showing of a genuine criminal agreement—a meeting of the minds—between at least two actors possessing the requisite criminal intent. See *State* v. *Grullon*, 212 Conn. 195, 201–203, 562 A.2d 481 (1989). Because the statute "requires a showing that two or more coconspirators intended to engage in or cause

conduct that constitutes a crime," we have determined that "a defendant cannot be guilty of conspiracy if the only other member of the alleged conspiracy lacks any criminal intent." Id., **199.** For example, in *Grullon*, we held that the defendant could not be found guilty of conspiracy when the sole alleged coconspirator was a police informant who lacked the requisite criminal intent. See id., **203–204.** Thus, "[u]nless the state prove[s] that some other person, with culpable intent, agreed with the defendant to violate the law, the defendant [is] entitled to acquittal" of the crime of conspiracy under § 53a-48. Id., **203.**

In the present case, the petitioner's actual innocence claim rests on his contention that he could not have formed a criminal agreement with Mathis because the trial court, in finding Mathis not guilty by reason of mental disease or defect of conspiracy to commit robbery in the first degree, determined that he "lacked the capacity to appreciate the wrongfulness of his conduct . . . ." According to the petitioner, that finding necessarily means that Mathis was incapable of forming the specific intent to conspire with the petitioner to rob the victim.

The habeas court rejected the petitioner's claim on the ground that, under *State* v. *Colon*, supra, 257 Conn. 602–603, inconsistent verdicts between separately tried alleged coconspirators are legally permissible, and, therefore, the fact that Mathis was subsequently acquitted did not establish that the petitioner was actually innocent of conspiracy to commit robbery. The Appellate Court concluded that the habeas court's reliance on *Colon* was misplaced because the rule permitting inconsistent verdicts in separate criminal trials is not applicable to a habeas petition asserting actual innocence. See *Moon* v. *Commissioner of Correction*, supra, 227 Conn. App. 858–60. The Appellate Court held that, in this procedural context, the habeas court must evaluate the entire evidentiary record—including the newly discovered transcripts and evidence from a codefendant's separate trial—as though it were a single body of evidence that

Moon *v.* Commissioner of Correction

would be presented to a fact finder if a new trial were to be conducted. Id., 860–61; see also *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 803.

We agree with the Appellate Court's reading of *Colon*. In *Colon*, we reasoned that, "[w]hen coconspirators are tried separately, the acquittal of one on charges of conspiracy should not dictate the acquittal of the other simply because the state in one case has failed to prove an element necessary to a conspiracy charge. . . . An . . . unsuccessful prosecution of an alleged coconspirator in a separate trial means nothing more than that on a given date the prosecution failed to meet its burden of proving the defendant guilty beyond a reasonable doubt of all of the elements constituting conspiracy. It certainly does not mean . . . that a conspiracy did not occur. It has long been recognized that criminal juries in the United States are free to [return] not guilty verdicts resulting from compromise, confusion, mistake, leniency or other legally and logically irrelevant factors. . . . Consequently, an acquittal is not to be taken as the equivalent of a finding of the fact of innocence; nor does it necessarily even reflect a failure of proof on the part of the prosecution." (Citations omitted; internal quotation marks omitted.) *State* v. *Colon*, supra, 257 Conn. 602–603. That reasoning has no application to a habeas petitioner's claim of actual innocence. When pursuing such a claim, the petitioner may rely on evidence from his alleged coconspirator's trial that was not available to the petitioner at his criminal trial,[3] including evidence that the alleged coconspirator lacked the intent to enter into the conspiracy. Ultimately, it is the petitioner's burden to establish that such newly discovered evidence, together

---

[3] Although the Appellate Court consistently has held that a claim of actual innocence must be based on newly discovered evidence, we have not opined on whether the evidence supporting an actual innocence claim must be newly discovered. See *Gould* v. *Commissioner of Correction*, supra, 301 Conn. 551 n.8; see also *Moon* v. *Commissioner of Correction*, supra, 227 Conn. App. 852–53. Because the respondent does not dispute that Mathis' acquittal and the evidence presented at his criminal trial constitute newly discovered evidence, we have no reason to address this issue in the present case.

Moon *v.* Commissioner of Correction

with the evidence from his criminal trial, proves clearly and convincingly that he is actually innocent and that no reasonable jury could find him guilty. We agree with the Appellate Court that applying *Colon* to an actual innocence claim, as the habeas court did in the present case, deprives a petitioner of an opportunity to prove his claim. Instead, the habeas court should have considered all of the evidence presented by the petitioner at the habeas trial to determine whether, in the aggregate, it established the petitioner's actual innocence.

II

The Appellate Court, recognizing its obligation to conduct "an independent and scrupulous examination of the entire record" and that the issue of whether no reasonable fact finder would find the petitioner guilty is a matter of plenary review; (internal quotation marks omitted) *Moon* v. *Commissioner of Correction*, supra, 227 Conn. App. 851–52; undertook the aggregate review the habeas court had not and concluded that "Mathis' acquittal establishes, by clear and convincing evidence, that he was unable to form any intent to conspire with the petitioner to rob the victim." Id., 867. The court emphasized that, in Mathis' trial, the state "did not dispute the fact that Mathis, a seriously ill schizophrenic at the time of the incident, was incapable of forming any intent to commit the crimes of which he was charged, including conspiracy, and was, therefore, not guilty of those crimes by reason of mental disease or defect pursuant to § 53a-13." Id., 864. Further, Mathis' psychiatric expert, Peter Morgan, testified that Mathis suffered from "severe symptoms" of paranoid schizophrenia and "lacked the capacity to understand the wrongfulness of his actions and could not conform his behavior to the law at the time of the incident." Id., 865.

The Appellate Court concluded that "a properly instructed jury could reasonably reach one conclusion, namely, that the petitioner was actually innocent of conspiring with Mathis to commit robbery in the first degree." Id., 867. In its view, "no crime of conspiracy

Moon *v.* Commissioner of Correction

could have been committed because Mathis was incapable of agreeing with the petitioner to commit robbery." Id. Thus, the Appellate Court held that "the evidence from the Mathis trial, if introduced in the context of a single trial of the petitioner, would give rise to a finding of actual innocence" because "[t]he undisputed fact that Mathis suffered from a mental illness that rendered him unable to form the intent to conspire mean[t] that no crime of conspiracy involving solely Mathis as coconspirator actually could have occurred." Id., 869.

Although we agree that the Appellate Court applied the correct legal standard, for the reasons that follow, we disagree with the Appellate Court's conclusion that Mathis' acquittal established by clear and convincing evidence that he could not have possessed the specific intent required to form a conspiratorial agreement with the petitioner under § 53a-48.

A

Because the petitioner's actual innocence claim rests on Mathis' subsequent acquittal, our analysis begins with the statute governing the affirmative defense of lack of capacity due to mental disease or defect, commonly referred to as the insanity defense.

Section 53a-13 (a) provides that, "[i]n any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time the defendant committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." The defense includes "both a cognitive and a volitional prong." (Internal quotation marks omitted.) *State* v. *LeRoya M.*, 340 Conn. 590, 611, 264 A.3d 983 (2021). The cognitive prong addresses the defendant's capacity to appreciate the wrongfulness of his conduct; the volitional prong addresses the defendant's capacity to conform his conduct to the law. See id., 611–12.

Moon *v.* Commissioner of Correction

We, like other courts, have long recognized that "there is an analytic distinction between mental status as it relates to the insanity defense and mental status as it relates to intent to engage in criminal conduct." *State* v. *Joyner*, 225 Conn. 450, 460–61, 625 A.2d 791 (1993); see also, e.g., *Mullaney* v. *Wilbur*, 421 U.S. 684, 705–706, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) (Rehnquist, J., concurring) ("[a]lthough . . . evidence relevant to insanity as defined by state law may also be relevant to whether the required mens rea was present, the existence or nonexistence of legal insanity bears no necessary relationship to the existence or nonexistence of the required mental elements of the crime" (citation omitted)); *State* v. *Griffin*, 159 A.3d 1240, 1243 (Me. 2017) ("[t]he defense of insanity does not raise a reasonable doubt as to an element of the crime, but instead excuses a defendant from criminal responsibility even though the [s]tate can prove each element of the crime"); *State* v. *Niska*, 514 N.W.2d 260, 264 n.4 (Minn. 1994) ("[the defense of] insanity involve[s] establishing a mental state distinct from the mens rea of the offense"); *Commonwealth* v. *Reilly*, 519 Pa. 550, 566, 549 A.2d 503 (1988) ("[i]n assessing sanity, a court is not concerned with whether the defendant committed the act . . . or . . . formed the prescribed mental state . . . [but with] whether [he] should be held criminally responsible for his act"); *State* v. *Box*, 109 Wn. 2d 320, 329, 745 P.2d 23 (1987) ("[I]nsanity entitles a defendant to an acquittal not because . . . [the] state has failed to prove [the] element of criminal intent . . . but because the state declines to convict or punish one shown to have committed the crime while mentally impaired. . . . In other words, the mental state of insanity does not go to the elements of the crime but merely the ultimate culpability of the accused." (Internal quotation marks omitted.)). In *Joyner*, the defendant argued that the burden placed on him pursuant to § 53a-13 to prove that his conduct was the product of a mental disease or defect violated the due process clauses of our state constitution because, once the issue of the defendant's mental status is raised, the defendant's sanity "then becomes

Moon *v.* Commissioner of Correction

one of the elements of the state's case," which our state constitution requires the state to prove beyond a reasonable doubt. *State* v. *Joyner*, supra, 458; see id., 456–57. After noting that the United States Supreme Court had rejected similar claims made pursuant to the federal due process clauses; id., 458; we considered whether a different result was compelled by our state constitution. Id., 459–65. We ultimately rejected the defendant's claim, holding that "sanity, like the absence of drug dependency . . . is an independent fact and not an element of any existing criminal offense. As to such an independent fact, as with regard to other affirmative defenses, the legislature has the constitutional authority to allocate the burden of proof to the defendant rather than to the state." (Citations omitted.) Id., 464–65; see also *State* v. *LeRoya M.*, supra, 340 Conn. 611–12.

We held in *Joyner* that § 53a-13 (a) does not violate a defendant's due process rights because it "shifts to the defendant the burden of establishing his or her mental status *only* with respect to the affirmative defense of insanity." (Emphasis added.) *State* v. *Joyner*, supra, 225 Conn. 461. It "does not purport to relieve the state of its continuing burden of proof with respect to mental status when mental status is implicated in the state's proof of an element of the crime, such as the defendant's specific intent to commit the crime with which he or she has been charged." Id. In other words, the state must prove beyond a reasonable doubt that the defendant possessed the requisite criminal intent to commit the charged offense, whereas the defendant must prove by a preponderance of the evidence that his conduct was the product of a mental disease or defect.[4] Thus, whether

---

[4] The United States Supreme Court's decision in *Clark* v. *Arizona*, 548 U.S. 735, 126 S. Ct. 2709, 165 L. Ed. 2d 842 (2006), in the context of the federal due process clauses, underscores this distinction. There, the court upheld a rule that permitted expert testimony about a defendant's diminished capacity due to mental disease or defect to be considered *only* for purposes of the insanity defense and barred its use to negate the mens rea element of a crime. See id., 756–57, 779. Compare id., 748, 756 (upholding formulation of insanity defense that incorporates only moral incapacity standard, which required that

Moon *v.* Commissioner of Correction

a defendant possesses the requisite intent to commit a crime is a distinct inquiry from whether he can prevail on an insanity defense under §53a-13 (a). In fact, a fact finder has no reason to consider a defendant's insanity defense unless the state has proven all of the elements of the charged crime, including the culpable intent, beyond a reasonable doubt. See Connecticut Criminal Jury Instructions 2.9-2, available at https://www.jud. ct.gov/JI/Criminal/Criminal.pdf (last visited February 6, 2026) (if state has proved all elements of crime charged, jury "must then go on to decide whether the defendant has proved the affirmative defense of lack of capacity due to mental disease or defect").

Against this backdrop, we turn to the petitioner's contention that Mathis' acquittal demonstrates that he was incapable of forming the specific intent to conspire with the petitioner to commit robbery. As we explain, neither the judgment of acquittal itself nor the evidence underlying it supports that conclusion.

First, the petitioner cannot rely on Mathis' insanity acquittal to prove his actual innocence because that judgment was reached under a lower burden of proof than the one the petitioner must satisfy to prevail on his actual innocence claim. In rendering its judgment, the trial court found that Mathis had established his affirmative defense by a preponderance of the evidence—that is, he proved that it was more likely than not that he satisfied one of the prongs of §53a-13 (a). See General Statutes §53a-12 (b); see also *State* v. *Weathers,* 339 Conn. 187, 209, 216, 260 A.3d 440 (2021). By contrast, to prevail on a claim of actual innocence, the petitioner must present evidence that clearly and convincingly demonstrates his actual innocence—"a very demanding standard . . . ." *Miller* v. *Commissioner of Correction*, supra, 242 Conn.

defendant demonstrate that "[he] did not know the criminal act was wrong" because of mental disease or defect (internal quotation marks omitted)), with *Kahler* v. *Kansas*, 589 U.S. 271, 276–77, 279, 140 S. Ct. 1021, 206 L. Ed. 2d 312 (2020) (upholding formulation of insanity defense requiring defendant to show that mental illness prevented him from forming requisite mens rea).

Moon *v.* Commissioner of Correction

795. The finding reached under a lower burden at Mathis' criminal trial therefore cannot be treated as clear and convincing proof in this habeas proceeding that Mathis lacked the intent necessary to conspire with the petitioner.

The order in which the court made its findings in Mathis' bench trial reinforces why the resulting verdict cannot bear the evidentiary weight that the petitioner assigns to it. The court conducted the bench trial in two phases. During the first phase, the court heard uncontested evidence of Mathis' involvement in the crimes charged and expressly found that the state had proven every element of those offenses beyond a reasonable doubt, including the specific intent to enter into a conspiracy to commit robbery. Only after making those findings did the court consider the affirmative defense and conclude that Mathis had met his burden of proving insanity by a preponderance of the evidence. Because the finding that resulted in Mathis' acquittal need satisfy only the preponderance standard, without more, it cannot serve as clear and convincing proof that Mathis lacked the criminal intent the court already had found beyond a reasonable doubt.

Second, as we previously noted, a finding of not guilty by reason of mental disease or defect does not necessarily equate to a finding that the acquittee lacked the specific intent to commit the charged offense. See *State* v. *Joyner*, supra, 225 Conn. 460–61. A judgment of not guilty by reason of mental disease or defect means that, at the time of the acquittee's conduct, he lacked substantial capacity "to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." General Statutes § 53a-13 (a). The finding itself does not address whether the acquittee intended the act he committed. Because the judgment in Mathis' trial does not resolve whether Mathis could have formed the specific intent to conspire to commit the robbery with the petitioner, we now turn to the evidence underlying that issue to determine whether it clearly and convincingly demonstrates a lack of such an intent. We conclude that it does not.

354 Conn. 181　　　FEBRUARY, 2026　　　203

Moon *v.* Commissioner of Correction

At the outset, we note that, although the trial court found that Mathis satisfied both prongs of the insanity defense contemplated under § 53a-13 (a), only the cognitive prong is at issue in this case. Indeed, a finding under the cognitive prong can, in certain circumstances, bear on a defendant's capacity to form a specific intent.[5] A finding under the volitional prong, by contrast, tells us nothing about what a defendant understood and intended when he engaged in the criminal conduct.

Our decisions in *State* v. *Wilson*, 242 Conn. 605, 700 A.2d 633 (1997), and *State* v. *Cole*, 254 Conn. 88, 755 A.2d 202 (2000), provide guidance as to when evidence of a mental disease or defect might negate the intent element of the charged offense. In *Wilson*, the defendant, who was charged with murder, raised a defense under the cognitive prong of § 53a-13 (a) based on his schizophrenia, which he claimed caused elaborate delusions.[6] See *State* v. *Wilson*, supra, 606–609. Although the defendant understood that killing the victim was illegal, he claimed that his delusions caused him to believe that the killing was morally justified—that "he had to do [it] in order to save other people" and that, in killing the victim, he had "saved the world." (Internal quotation marks omitted.) Id., 626. The jury rejected the affirmative defense and found the defendant guilty of murder. Id., 609. On appeal, the defendant argued that the court's charge to the jury on his insanity defense was inadequate because it failed to instruct the jury that he "was entitled to prevail under § 53a-13 (a) if the evidence established that [he] believed his conduct to be morally justified." Id., 610.

We agreed that the cognitive prong of § 53a-13 (a) encompasses a moral dimension of "wrongfulness." Id., 622–23. This includes "cases in which a defendant's delusional ideation causes him to harbor personal beliefs

[5] See, e.g., *State* v. *Madigosky*, 291 Conn. 28, 41–42, 966 A.2d 730 (2009). *Madigosky* is discussed in part II C of this opinion.

[6] The defendant in *Wilson* delusionally believed that the victim "was the mastermind of a large organization bent on controlling the minds of others" and had been drugging and brainwashing the defendant and others. *State* v. *Wilson*, supra, 242 Conn. 608.

Moon *v.* Commissioner of Correction

that so cloud his cognition as to render him incapable of recognizing the broader moral implications of his actions. . . . Those cases involving the so-called 'deific command,' in our view, fall into this category. . . . An individual laboring under a delusion that causes him to believe in the divine approbation of his conduct is an individual who, in all practicality, is unlikely to be able fully to appreciate the wrongfulness of that conduct." Id., 619. We concluded that "a defendant does not truly 'appreciate the wrongfulness of his conduct' as stated in §53a-13(a) if a mental disease or defect causes him both to harbor a distorted perception of reality and to believe that, under the circumstances as he honestly perceives them, his actions do not offend societal morality, even though he may also be aware that society, on the basis of the criminal code, does not condone his actions. Thus, a defendant would be entitled to prevail under §53a-13(a) if, as a result of his mental disease or defect, he sincerely believes that society would approve of his conduct if it shared his understanding of the circumstances underlying his actions." (Emphasis omitted.) Id., 622–23. This formulation of the insanity defense makes clear that a defendant can both possess the specific intent to commit the underlying offense and still prove the cognitive prong of the defense. As the facts in *Wilson* demonstrate, there is no irreconcilable conflict between the two.

In *State* v. *Cole,* supra, 254 Conn. 88, we discussed the intersection of the cognitive prong of §53a-13(a) and criminal intent in a different context. There, the defendant, who was charged with the murder of his girlfriend, raised an affirmative defense under the cognitive prong of §53a-13(a) based on his chronic paranoid schizophrenia, which produced hallucinations and delusions. Id., 89–91, 94–96. The defendant claimed that his mental illness caused him to delusionally believe that "the victim was not his girlfriend, but, rather, an evil double who had been sent to replace her"; id., 96; and that she was going to kill him if he did not shoot her first. Id., 95. The jury rejected the affirmative defense and found him guilty of murder. Id., 89, 97–98.

Moon *v.* Commissioner of Correction

On appeal, the defendant claimed that the trial court's jury charge on the insanity defense was improper because it did not include an instruction that "wrongfulness" under § 53a-13 (a) includes a moral component that incorporates standards of societal morality, as articulated in *Wilson*. Id., 100–103. We rejected that claim and held that, under the facts of that case, such an instruction was unnecessary. Id., 104–106. We explained that, in "most cases in which the insanity defense is raised. . . society's moral judgment regarding the accused's conduct will be identical to the legal standard reflected in the applicable criminal statute"; id., 102; and, thus, it is "the unusual case in which the distinction between wrongfulness and criminality [is] . . . determinative . . . ." (Internal quotation marks omitted.) Id., 103. *Wilson* was one such unusual case because the defendant there "knew that his conduct was illegal but nevertheless believed that his actions were justified under principles of societal morality . . . ." Id., 102. *Cole*, on the other hand, was not such a case. See id., 103. The defendant in *Cole* did not claim that he believed his conduct was morally justified despite knowing that it was illegal; rather, he claimed that he delusionally believed the victim posed an imminent threat to his life and that he was acting in self-defense when he killed her. See id., 95–96, 104. Because "society recognizes that one who acts in self-defense is justified in doing so under both legal and moral standards," the defendant's belief did not implicate the distinction between illegality and morality that was central in *Wilson*. Id., 104. Accordingly, "the trial court's failure to define wrongfulness as including a moral component for purposes of § 53a-13 (a) could not have possibly inured to the detriment of the defendant." Id., 106.

As the foregoing case law demonstrates, there are two distinct ways in which cognitive impairment caused by a mental disease or defect may impact a defendant's culpability. In some cases, as in *Wilson*, the defendant may fully intend the criminal act but, due to mental disease or defect, lack the capacity to appreciate its wrongfulness. In such cases, the mental impairment alters the defendant's moral or evaluative understanding of his actions,

Moon *v.* Commissioner of Correction

not his ability to form specific intent. In other cases, the defendant's mental disease or defect may so distort his perception of reality that it may negate criminal intent.

We focused on this latter type of impairment in *State* v. *Madigosky*, 291 Conn. 28, 966 A.2d 730 (2009), noting that "[t]here may be a case in which a defendant's insanity defense evidence actually challenges the intent element of the crime, one in which the defendant's mental state is such that he intends to engage in the conduct for which he is charged, but, because of a mental disease or defect or his extreme emotional state, does not act with the specific intent required for the charged offense. By way of example, if an accused intentionally engaged in conduct—the stabbing of a person—but, because of his mental state, thought he was stabbing a piece of meat, the jury's function to assess whether the state had proved the elements of the crime beyond a reasonable doubt would require it to consider his affirmative defense evidence in concert with its assessment of his intent. In other words, the affirmative defenses in that case would intersect with an essential element of the offense." Id., 41–42.

These cases demonstrate that only in certain circumstances will a defendant's cognitive delusions bear on his capacity to form specific intent; whether they do so is a fact dependent inquiry turning on the evidence of the nature and extent of the particular mental disease or defect.

B

Mindful of this distinction between those cognitive impairments occurring as a result of mental disease or defect that leave intent intact and those that may negate intent, we consider whether the aggregate record before the habeas court, including the transcripts from Mathis' criminal trial, contains the clear and convincing evidence necessary to establish the petitioner's actual innocence.[7]

The relevant facts from Mathis' trial, which form part of the aggregate record before us, are as follows. During

[7] We note, as the Appellate Court did, that the record before the habeas court did not include the exhibits introduced at either the petitioner's or Mathis' criminal trial. See *Moon* v. *Commissioner of Correction*,

Moon *v.* Commissioner of Correction

the state's case-in-chief, the prosecutor called Reeder, the lead investigator into the homicide of the victim, who testified about the circumstances of the homicide and his interactions with Mathis during the investigation. Reeder testified that he spoke with Mathis and Mathis' mother at approximately 2:30 a.m. the morning after the homicide. He testified that Mathis told him that, the prior evening before the homicide, the petitioner had come to Mathis' house. The two men then walked back to the petitioner's house, where they smoked marijuana and the petitioner borrowed Mathis' cell phone. Mathis then claimed that he walked back to his home and remained there. Mathis showed Reeder his cell phone, from which Reeder was able to obtain a series of text messages and phone calls between Mathis' phone and the victim's phone. Reeder also testified that he spoke with several eyewitnesses who placed Mathis in the area around the time of the homicide. The state also introduced the statements of Hightower and Thompson. Reeder testified that Thompson told him that Thompson and the petitioner had initially planned to commit the robbery together and that the petitioner "had only gotten [Mathis involved] because [Thompson] was not available to do the robbery on the day that the [incident] happened." Thompson also claimed that he and the petitioner had discussed the robbery with Mathis after it occurred. Reeder was the state's only witness, and Mathis' counsel did not cross-examine Reeder.

The following day, counsel delivered closing arguments as to the underlying offenses. The prosecutor argued that, based on the facts and circumstances as presented, each offense had been proven beyond a reasonable doubt. Defense counsel did not deliver a closing argument, instead "leav[ing][it] to the court's discretion and judgment." After having heard and reviewed all of the evidence, the trial court concluded that the state

supra, 227 Conn. App. 846 n.7. Thus, the only evidence the petitioner submitted in support of his actual innocence claim were the transcripts from both criminal trials, the petitioner's judgment mittimus, and the information and disposition from Mathis' criminal trial. See id.

Moon *v.* Commissioner of Correction

had carried its burden of proving each of the charged offenses beyond a reasonable doubt. In particular, the court found that the state had "proven beyond a reasonable doubt the conspiracy to commit robbery in the first degree. The [conspiracy] is most evident from the phone calls that were made in advance, phone calls from [Mathis'] phone. That is how the [victim] was lured to the Allendale [Road] area. . . . It wasn't impulsive. There was a plan. And, certainly . . . the intent of the conduct was to [commit] robbery in the first degree."

After concluding that the elements of all three offenses had been proven beyond a reasonable doubt, the trial court heard evidence on Mathis' affirmative defense. Defense counsel introduced the testimony and report[8] of Morgan, a psychiatrist who evaluated Mathis on three occasions between 2015 and 2017. Morgan testified that he spent more than two hours interviewing Mathis and had reviewed extensive collateral records, including police materials, medical records, an evaluation of Mathis' competency to testify authored by Howard Zonana, a forensic psychiatrist, at the request of the state, and an evaluation of Mathis' competency to stand trial. Morgan explained that Mathis' medical records documented a long-standing diagnosis of paranoid type schizrenia dating back to at least age seventeen, with repeated inpatient hospitalizations and persistent psychotic symptoms—including delusions and auditory hallucinations—throughout the year surrounding the homicide. Mathis had been discharged from the hospital approximately six days prior to the homicide. Morgan concurred with the prior diagnoses and with Zonana's conclusion that the symptoms of Mathis' schizophrenia impaired his perception of reality.

Based on his evaluation and the reviewed records, Morgan opined that, to a reasonable degree of medical certainty, Mathis suffered from severe schizophrenia and, at the time of the alleged criminal conduct, "did

---

[8] Morgan's report was not before the habeas court. See footnote 7 of this opinion.

Moon *v.* Commissioner of Correction

not have the capacity to understand the wrongfulness of his actions [or to] conform his behavior to the law." The prosecutor did not challenge Morgan's conclusions regarding Mathis' mental condition, offer any expert to opine on Mathis' mental illness, or provide any rebuttal to Morgan's testimony. In his closing argument concerning the affirmative defense, the prosecutor did "not contest [defense] counsel's argument as made and supported by the evidence presented by . . . Morgan in this matter." The trial court subsequently found that Mathis had met his burden of proving that he "lacked the capacity to appreciate the wrongfulness of his conduct and to conform his behavior to the requirements of the law."

Following a forensic psychiatric evaluation, Rina Kapoor testified at Mathis' commitment hearing that Mathis had some significant symptoms of paranoia and persecution, as well as problems with organization, motivation, and execution of activities. She opined that Mathis' schizophrenia had interfered with his ability to reason and that he was vulnerable to peer influence. Kapoor explained that Mathis had consistently said that he did not "do anything except for lend [his] friend [his] cell phone" and that Mathis did not seem to "[have] a grasp on what went wrong or how [his] illness contributed to [the] offense." At that time, Kapoor recommended that Mathis be committed to the Psychiatric Security Review Board and remain in a maximum security hospital.

C

This record is not sufficient to permit us to determine which of the two scenarios—intent preserved but wrongfulness not appreciated, or intent itself impaired—is implicated by Mathis' mental condition at the time of the offense.

Although Morgan testified that Mathis had suffered from severe paranoid type schizophrenia accompanied by symptoms of psychosis, including delusions and auditory hallucinations, nothing in Morgan's testimony or in the trial court's findings identifies the functional impact of

Moon *v.* Commissioner of Correction

those symptoms on Mathis' capacity to form intent. In particular, the presence of delusions or hallucinations does not inform us whether a defendant has acted with specific intent. See, e.g., *State* v. *Madigosky*, supra, 291 Conn. 33, 40; *State* v. *Wilson*, supra, 242 Conn. 608–609. As we explained previously, in *Wilson*, the defendant's schizophrenia produced elaborate delusions that distorted his understanding of the morality of his actions, yet there was no dispute that he acted with the specific intent to kill. See *State* v. *Wilson*, supra, 626–27. By contrast, as the hypothetical illustration in *Madigosky* demonstrates, a defendant's misperception of reality may be so severe that it impairs his or her ability to act with the requisite criminal intent. See *State* v. *Madigosky*, supra, 42. The record from Mathis' trial does not demonstrate that Mathis' impairment affected his ability to act with the specific intent to agree to commit the robbery with the petitioner. Morgan's testimony established only that Mathis suffered from schizophrenia and that he lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law. Notably, however, Morgan did not opine—and was not asked to opine—on whether Mathis was able to form the specific intent to commit the charged offenses. Nor did the trial court make any affirmative finding to that effect. This record contains no evidence that anyone believed that Mathis did not intend to conspire with the petitioner to rob the victim. To the contrary, the court in Mathis' criminal trial expressly found that the state had proven *all* of the elements of each offense, which included the specific intent to agree to commit the robbery with the petitioner, and did not alter that finding after hearing Morgan's testimony.

Because the same symptoms—e.g., hallucinations, paranoid and persecutory delusions, disorganized thinking—can evidence either an impairment that excuses an intentional act, or an impairment that may undermine the formation of intent, the newly discovered evidence from Mathis' trial does not clearly and convincingly

establish that Mathis' impairment negated the specific intent required for conspiracy to commit robbery.

The petitioner's failure to satisfy his burden in this regard is dispositive of his actual innocence claim, which requires clear and convincing evidence that "unquestionably establish[es] [his] innocence"; (internal quotation marks omitted) *Miller* v. *Commissioner of Correction*, supra, 242 Conn. 795; such that "no reasonable fact finder would find the petitioner guilty of the crime." Id., 747. Indeed, "the clear and convincing evidence standard . . . forbids relief whenever the evidence is loose, equivocal or contradictory." (Internal quotation marks omitted.) Id., 795. Because the record contains no evidence reflective of a scenario in which the defendant's mental illness negated the formation of specific intent; see, e.g., *State* v. *Madigosky*, supra, 291 Conn. 41–42; the petitioner has failed to prove by clear and convincing evidence that Mathis lacked the specific intent to enter into a conspiracy with the petitioner to commit the robbery.[9]

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

---

[9] Because we conclude that the petitioner failed to prove his actual innocence of conspiracy to commit first degree robbery with Mathis, we do not consider whether the Appellate Court correctly determined that the petitioner had failed to prove his actual innocence in light of the purported conspiracy between the petitioner and Thompson.